E
X
H
I
B
I
T

A

**EXHIBIT A**



# FACE PAGE

**This page is the face of the policy referenced by number below and is a part of the policy.**

Insured's Name: <u>Andrews Institute ASC, LLC</u>
Policy Number: <u>FLP0054437-03</u>         Policy Dates:  From: <u>4/15/2016</u>  To: <u>4/15/2017</u>

| | |
|---|---|
| Surplus Lines Agent's Name: | <u>Marcia Whisman</u> |
| Surplus Lines Agent's Address: | <u>7700 West Camino Real Suite # 201</u> |
| | <u>Boca raton, FL 33433</u> |
| Surplus Lines Agent's License: | <u># P134922</u> |
| Producing Agent's Name: | Stuart Freeman |
| Producing Agent's Physical Address: | 1000 Urban Center DriveSuite 400 |
| | Birmingham, AL 35242 |

**"THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER."**

## "SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY."

| | | | |
|---|---|---|---|
| Policy Premium: | $76,174.00 | Policy Fee: | $35.00 |
| Inspection Fee: | | Service Fee: | $114.31 |
| Tax: | $3,810.45 | Citizen's Assessment: | |
| EMPA Surcharge: | | FHCF Assessment: | |

Surplus Lines Agent's Countersignature: _____

If this policy is a surplus lines, personal lines residential property policy then the following shall apply:

## "THIS POLICY CONTAINS A CO-PAY PROVISION THAT MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU."

If this policy is a surplus lines, personal lines residential property policy which includes the peril of windstorm then the following shall apply:

## "THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE OR WIND LOSSES, WHICH MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU."



**IMPORTANT NOTICE**

Enclosed you will find the policy you requested from Arch Healthcare.   We trust that you will find the policy to be in order.

As a reminder, it is your responsibility to conform with the laws and regulations of the applicable jurisdiction, including, but not limited to, payment of premium, taxes, procuring of affidavits and compliance with the surplus lines laws.  For any policy providing coverage, other than Healthcare Professional Liability, in the state of Florida this includes the Florida Hurricane Catastrophe Fund emergency assessment which became effective January 1, 2007.

We want to take this opportunity to thank you for your business, if you have any questions regarding the policy please do not hesitate to contact us.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# TERRORISM COVERAGE DISCLOSURE NOTICE

## TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2015 (collectively referred to as the "Act") established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.  An act of terrorism is defined as any act certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism.  The policy's other provisions will still apply to such an act.  **This offer does not include coverage for incidents of nuclear, biological, chemical, or radiological terrorism which will be excluded from your policy**.  Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism.  In those states, if terrorism results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property.  Such coverage for fire applies only to direct loss or damage by fire to Covered Property.  Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium will include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

## DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  **The federal share equals 85% in 2015, 84% in 2016, 83% in 2017, 82% in 2018, 81% in 2019, and 80% in 2020 of that portion of the amount of such insured losses that exceeds the applicable insurer deductible during Calendar Year 2015 and each Calendar Year thereafter through 2020.**

## DISCLOSURE OF CAP ON ANNUAL LIABILITY

If the aggregate insured terrorism losses of all insurers exceed $100,000,000,000 during any **Calendar** Year provided in the Act, the Secretary of the Treasury shall not make any payments for any portion of the amount of such losses that exceed $100,000,000,000, and if we have met our insurer deductible, we shall not be liable for the payment of any portion of such losses that exceeds $100,000,000,000.

## DISCLOSURE OF PREMIUM

Your premium for terrorism coverage is: $241.00
(This charge/amount is applied to obtain the final premium.)
**You may choose to reject the offer by signing the statement below and returning it to us.  Your policy will be changed to exclude the described coverage.**  If you chose to accept this offer, this form does not have to be returned.

## REJECTION STATEMENT

| I hereby decline to purchase coverage for certified acts of terrorism.  I understand that an exclusion of certain terrorism losses will be made part of this policy. |
| --- |

|  | Andrews Institute Ambulatory Surgery Center, LLC |
| --- | --- |
| Policyholder/Legal Representative/Applicant's Signature | Named Insured |
|  | Arch Specialty Insurance Company |
| Print Name of Policyholder/Legal Representative /Applicant | Insurance Company |
| Date: | Policy Number: FLP0054437-03 |

# SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.



## ARCH SPECIALTY INSURANCE COMPANY
### (A Missouri Corporation)

Home Office Address:
2345 Grand Blvd., Suite 900
Kansas City, MO  64108

Administrative Address:
1125 Sanctuary Parkway, Suite 200
Alpharetta, GA  30009
Tel: (404) 682-3700

## INTRODUCTION

Policy Number:   FLP0054437-03
Renewal of:      FLP0054437-02

This policy consists of the Introduction, Declarations(s), Common Policy Conditions and Coverage Part(s). It also may contain one or more endorsements.  We ask that you carefully read your entire policy to understand the scope of coverage provided, limitations or restrictions, rights and duties that apply under this policy.

**In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.**

The words "we", "us", and "our" refer to the company providing this insurance, Arch Specialty Insurance Company.

The words "you" and "your" refer to the Named Insured, which is a/an Limited Liability Company.

**NAMED INSURED:**

Andrews Institute Ambulatory Surgery Center, LLC
1040 Gulf Breeze Parkway #100
Gulf Breeze, FL  32561

**PREMIUM:**

| | |
|---|---|
| Professional Liability | $69,924.00 |
| General Liability | $6,250.00 |
| **Total Premium:** | $76,174.00 |

*Refer to the Common Policy Conditions for additional information regarding your premium.*

You have elected to purchase coverage offered under the Terrorism Risk Insurance Act.  The charge for this coverage is $241.00 and is included in the total premium indicated above.

**Policy Period:**

From April 15, 2016 to April 15, 2017 at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:**

Surgery Center

**Producing Agent:**

CRC Insurance Services, Inc.
One Metroplex Drive
Suite 400
Birmingham, AL   35209

Countersigned By:   _____       Title: _____
                                    (Authorized Representative)

Issue Date:              04/15/2016

Arch Specialty Insurance Company is licensed in the state of Missouri only.



Signature Page

IN WITNESS WHEREOF, Arch Specialty Insurance Company has caused this policy to be executed and attested.

<table>
<tr><td>_____<br>John Mentz<br>President</td><td>_____<br>Patrick K. Nails<br>Secretary</td></tr>
</table>

## SCHEDULE OF FORMS AND ENDORSEMENTS

| NAMED INSURED: | Andrews Institute Ambulatory Surgery Center, LLC | TERM: April 15, 2016 to April 15, 2017 |
| --- | --- | --- |
| POLICY NUMBER: | FLP0054437-03 | |

| ENDT. NO. | FORM NO. | TITLE |
| --- | --- | --- |
| | 00 ML0065 00 06 07 | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") |
| | 00 MLT0031 00 01 15 | TERRORISM COVERAGE DISCLOSURE NOTICE |
| | 06 ML0002 00 12 14 | SIGNATURE PAGE (ARCH SPECIALTY) |
| | 06 HML0017 00 03 08 | CLAIMS NOTIFICATION |
| 1 | 00 ML0003 00 04 12 | SERVICE OF SUIT |
| 2 | 02 HML0005 00 03 07 | COMMON POLICY CONDITIONS |
| 3 | 02 HML0018 10 06 04 | AMENDATORY ENDORSEMENT - FLORIDA |
| 4 | 02 HML0003 00 05 13 | YOUR DUTIES IN THE EVENT OF AN ACCIDENT, OCCURRENCE, MEDICAL INCIDENT, CLAIM OR SUIT |
| 5 | 02 HML0007 00 03 07 | GOVERNMENT ACCESS TO RECORDS ENDORSEMENT |
| 6 | 02 HML0024 00 01 15 | WAR, CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM CHANGE ENDORSEMENT |
| 7 | 00 ML0207 00 11 03 | COVERAGE CHANGE ENDORSEMENT |
| 8 | 02 HML0025 00 03 07 | KNOWN ACCIDENT, OCCURRENCE, MEDICAL INCIDENT, CLAIM OR SUIT EXCLUSION ENDORSEMENT |
| | 02 HPL0002 00 02 07 | HEALTHCARE PROFESSIONAL LIABILITY COVERAGE FORM |
| 9 | 00 HPL0133 00 11 13 | NET PROTECTION PLUS/REGULATORY DEFENSE PLUS COVERAGE NOTICE TO POLICYHOLDER |
| | 02 HGL0002 00 02 07 | HEALTHCARE GENERAL LIABILITY COVERAGE FORM |
| 10 | 02 HGL0006 00 03 07 | EMPLOYEE BENEFITS LIABILITY COVERAGE ENDORSEMENT |

# CLAIMS NOTIFICATION

An important value of your insurance coverage is the ability of the insurance company to respond when you have a claim.  Arch Specialty Insurance Company is committed to providing its insureds with effective claim services.

Coverage parts and their endorsements may include other requirements for:

1.  Your having knowledge, or providing notice of an accident or incident; or

2.  Reporting claims made or "suits" brought

as part of the coverage trigger requirements. As a result, you should read the coverage parts and their endorsements carefully to understand the extent of the coverage provided and any specific knowledge and notice requirements that may apply.

Notices of each incident, claim or suit must be sent immediately to:

Arch Specialty Insurance Company
Healthcare Claims
1299 Farnam Street, Suite 500
Omaha, NE  68102
P.O. Box 542033
Omaha, NE  68154
Phone:  877 688-ARCH (2724)
Fax:  866 266-3630
E-mail:  Claims@ArchInsurance.com

You will be contacted by a representative of the company's Claim Department. This representative will confirm receipt of the notice of loss directly to you, provide a company claim number for all future correspondence, refer you to legal counsel if necessary, and discuss further handling of the claim.

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**SERVICE OF SUIT**

It is agreed that:

1.  In the event of the failure of the **Insurer** to pay any amount claimed to be due hereunder, the **Insurer**, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  All matters arising under this Policy shall be determined in accordance with the law and practice of such Court, provided that nothing shall prohibit the **Insurer** from removing any action, suit or proceeding to a United States District Court.  The **Insurer** shall abide by the final decision of such court or any appellate court in the event of an appeal.

2.  Service of process in the above described action, suit or proceeding may be made upon: General Counsel, Arch Insurance Group Inc., 300 Plaza Three, Jersey City, NJ 07311-1107.  Upon the request of the **Insured**, such General Counsel shall give a written undertaking to enter an appearance on behalf of the **Insurer** in the event that such an action, suit or proceeding shall be instituted.

3.  Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the **Insurer** hereby designates the Superintendent, Commissioner, or Director of Insurance or other officer specified in such statute as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted against the **Insurer** upon this Policy.  The Superintendent, Commissioner or Director of Insurance or other officer is hereby authorized and directed to accept service of process on behalf of the **Insurer** in any such action, suit or proceeding and to mail a copy of such process to the above mentioned General Counsel.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  1

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**COMMON POLICY CONDITIONS**

This endorsement modifies insurance provided under the following:

> All coverage forms included in this policy.

**1.     Your Policy Period**

Coverage Parts in this policy begin at 12:01 a.m., standard time, on the effective date.  If this policy replaces policies ending at noon, rather than 12:01 a.m., coverage begins at noon when the old policy ends.

Coverage Parts or endorsements added to this policy after its effective date begin on the effective date of the added agreement.

Coverage ends at 12:01 a.m., standard time, on the expiration date.  If all or part of this policy is cancelled for any reason before that date, the coverage will end at 12:01 a.m., standard time, on the cancellation date.

**2.     Cancellation**

The first Named Insured shown in the Introduction may cancel this policy by mailing or delivering to us advance written notice of cancellation.

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.**     Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.**     Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

Notice of cancellation will state the effective date of cancellation.  The policy period will end on that date.

If this policy is cancelled, we will send the first Named Insured any premium refund due.  If we cancel, the refund will be pro rata.  If the first Named Insured cancels, the refund may be less than pro rata.  The cancellation will be effective even if we have not made or offered a refund.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**3.     When We Do Not Renew**

If we decided not to renew this policy, we will mail or deliver to the first Named Insured shown in the Introduction written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**4.     Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Introduction is authorized to make changes in the terms of this policy with our consent.  This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**5.    Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**6.    Inspections And Surveys**

We have the right, but not the duty to:

**a.**    Make inspections and surveys at any time;

**b.**    Give you reports on the conditions we find; and

**c.**    Recommend changes.

We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged.  We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.  And we do not warrant that conditions:

**(1)**    Are safe or healthful; or

**(2)**    Comply with laws regulations, codes or standards.

**Paragraphs 6.a.** and **6.b.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**Paragraph 6.b.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**7.    Premiums**

The first Named Insured shown in the Introduction:

**a.**    Is responsible for the payment of all premiums; and

**b.**    Will be the payee for any return premiums we pay.

In some instances, such as when coverage under your policy is changed, there may be a difference in your premium.  If the difference in premium that you owe us is $50 or less, we will waive this amount.  If the difference in premium we owe you is $50 or less, we won't refund this amount unless you request that we refund it.  We will apply this waiver of premium practice separately each time your policy is changed.

**8.    Minimum Earned Premium**

If you cancel this policy during the policy period we will retain a minimum earned premium equal to

25% of the policy premium.

9. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the course and scope of duties as your legal representative. Until your legal representative is appointed, anyone having authorized temporary custody of your property will have your rights and duties but only with respect to that property.

10. **Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

11. **Legal Action Against Us**

No person or organization has a right under this policy:

a. To join us as a party or otherwise bring us into a "claim" or "suit" asking for damages from an insured; or

b. To sue us on this policy unless all of its terms have been fully complied with. A person or organization may sue us to recover on a settlement agreed to by us or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured, and the claimant or the claimant's legal representative.

12. **Premium Audit**

We will compute all premiums for this policy in accordance with our rules and rates.

Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

13. **Representations**

By accepting this policy, you agree:

a. The statements in the Introduction and Declarations are accurate and complete; and

b. The policy is issued based upon the completeness and accuracy of representations you made to us. This policy is void if you or any insured hide important information from us, mislead us, or attempt to defraud or lie to us about any matter concerning this insurance – either before or after a loss. Unintentional errors or omissions will not affect your rights

under this policy.

**14.   Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this endorsement to the first Named Insured, this insurance applies:

**a.**      As if each Named Insured were the only Named Insured; and

**b.**      Separately to each insured against whom "claim" is made or "suit" is brought.

**15.   Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us.   The insured must do nothing after a loss to impair them.   At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**16.   State Specific Laws**

Any part of this policy that conflicts with state law is automatically changed to conform to the law.

All other terms of your policy remain unchanged.

Endorsement Number:  2

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT - FLORIDA**

This endorsement modifies insurance provided under the following:

      Common Policy Conditions

**I.**     Section **2., Cancellation**, of the Common Policy Conditions is replaced by the following:

**2.**     **Cancellation**

     The first Named Insured shown in the Introduction may cancel this policy by mailing or delivering to us advance written notice of cancellation.

     If this policy is cancelled, we will send the first Named Insured any premium refund due.   If we cancel, the refund will be pro rata.   If the first Named Insured cancels, the refund may be less than pro rata.   The cancellation will be effective even if we have not made or offered a refund.

     **a.**     If this policy has been in effect for ninety (90) days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

          **(1)**     Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium or loss of license; or

          **(2)**     Ninety (90) days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

               **(a)**     A material misstatement or misrepresentation; or

               **(b)**     A failure to comply with the underwriting requirements established by the insurer.

     **b.**     If this policy has been in effect for more than ninety (90) days, we may cancel this policy only for one or more of the following reasons:

          **(1)**     Nonpayment of premium;

          **(2)**     The policy was obtained by a material misstatement;

          **(3)**     Failure to comply with underwriting requirements established by the insurer within ninety (90) days of the effective date of coverage;

          **(4)**     A substantial change in the risk covered by the policy; or

          **(5)**     The cancellation is for all insureds under such policies for a given class of insureds.

              If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

               **(a)**     Ten (10) days before the effective date of cancellation if we cancel for non-payment of premium; or

      **(b)**    Ninety (90) days before the effective date of cancellation if we cancel for any of the other reasons stated in Paragraph **2.b**.

**II.**    Section **3., When We Do Not Renew**, of the Common Policy Conditions is replaced by the following:

**3.**    **When We Do Not Renew**

    **a.**    If we decide not to renew this policy, we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least:

      **(1)**    Ten (10) days prior to the expiration of this policy, if we nonrenew for nonpayment of premium or loss of license; or

      **(2)**    Ninety (90) days prior to the expiration of this policy, if we nonrenew for any other reason.

    **b.**    Any notice of nonrenewal will be mailed or delivered to the first Named Insured's last mailing address known to us.  If notice is mailed, proof of mailing will be sufficient proof of notice.

**Other Terms:**

All other terms of your policy remain unchanged.

Endorsement Number:  3

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**YOUR DUTIES IN THE EVENT OF AN ACCIDENT, OCCURRENCE, MEDICAL INCIDENT, CLAIM OR SUIT**

This endorsement modifies insurance provided under the following:

> Healthcare Professional Liability Coverage Form or
> Healthcare General Liability Coverage Form;
> Healthcare Provider Liability Coverage Form,

whichever applies.

If an accident, "medical incident", "occurrence", "claim" or "suit" happens that may involve liability coverage provided by this policy, you or any insured involved must do the following:

**1.** You must see to it that we are notified as soon as practicable of an accident, "medical incident", "occurrence" or circumstance which may reasonably result in a "claim" or "suit".  This notice should include all of the following:

    **a.** Specific circumstances surrounding the accident, "medical incident" or "occurrence" including the time, location and full description of the accident, "medical incident" or "occurrence";

    **b.** The names and addresses of any injured persons and witnesses;

    **c.** The nature of any injury arising out of the accident, "medical incident" or "occurrence" including the reason you feel this will result in a covered "claim" or "suit"; and

    **d.** The names of all insureds involved.

We will not consider a patient incident report, variance report, or any other report, made for loss prevention purposes, to be your report of a "claim" or "suit", even if you send it to us or one of our agents.

**2.** If a "claim" or "suit" is received by any insured, you must:

    **a.** Immediately record the specifics of the "claim" or "suit" and the date received; and

    **b.** Notify us in writing as soon as practicable.

**3.** You and any other involved insured must:

    **a.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

    **b.** Authorize us to obtain records and other information;

    **c.** Cooperate and assist us in securing and giving evidence, attending hearings and trials and obtaining the attendance of witnesses;

    **d.** Cooperate with us in the investigation or settlement of the "claim" or defense of the "suit"; and

    **e.** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury to which this insurance

may also apply.

**4.**     No insured will voluntarily make a payment, assume any obligation or admit liability, incur any expense, or settle any "claim" or "suit" to which this coverage applies without our consent.   This does not apply to first aid given to others at the time of an accident.

All other terms of your policy remain unchanged.

Endorsement Number: 4

Policy Number: FLP0054437-03

Named Insured: Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**GOVERNMENT ACCESS TO RECORDS ENDORSEMENT**

This endorsement modifies insurance provided under the following:

All coverage forms included in this policy.

This endorsement changes your policy to comply with federal law.

This endorsement changes your policy to comply with the requirements of Section 952 of the Omnibus Reconciliation Act of 1980.   Upon written request, we will allow the Secretary of Health and Human Services and the Comptroller General access to the policy and necessary books, documents and records to verify the cost of the policy, to the extent required by law.  Access will also be allowed to subcontracts between us and any related organization of ours and to its books, documents and records.  Such access will be provided up to four years after the services furnished under this policy end.

All other terms of your policy remain unchanged.

Endorsement Number:  5

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**WAR, CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM
CHANGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

> All coverage forms included in this policy.

**I.**     The War or Terrorism exclusion is deleted from the **Exclusions** section of your policy.

**II.**     The following exclusions are added to the **Exclusions** section of your policy.

**War**

> "Bodily injury", "property damage", "personal or advertising injury" or "medical professional injury" that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with:

> **a.**     War, including undeclared or civil war; or

> **b.**     Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

> **c.**     Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

> regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**Terrorism**

> "Bodily injury", "property damage", "personal or advertising injury" or "medical professional injury" that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with an "act of terrorism", including action in hindering, controlling, preventing, suppressing, retaliating against, responding to or defending against an actual or expected "act of terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

> This exclusion also applies to an "act of terrorism" or a "certified act of terrorism" that:

> **a.**     Is carried out by means of dispersal or application of radioactive material or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

> **b.**     Involves radioactive material that is released and it appears that one purpose of the "act of terrorism" was to release such material; or

> **c.**     Involves the use, release, or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

> **d.**     Is carried out by means of the dispersal or application of pathogenic or poisonous biological

     © 2006 – 2007 Arch Insurance Group, Inc.
Includes copyrighted material of Insurance
Services Office, Inc.

or chemical materials; or

**e.**   In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "act of terrorism" was to release such materials.

This exclusion does not apply to "bodily injury", "property damage", or "personal or advertising injury" that results from a "certified act of terrorism". This exception to the exclusion is limited to an insured loss as defined in the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto. However, the exclusion will continue to apply to any "certified act of terrorism" that is carried out by or involves any of the methods or means listed in items **a**, **b**, **c**, **d** or **e** of the preceding paragraph.

Coverage provided under the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto is subject to any applicable deductibles, self-insured retentions and/or attachment points shown in the coverage summary. In no event shall this coverage drop down, or apply unless and until a loss exceeding such deductible, self-insured retention or attachment point is sustained. Should this clause conflict in any way with other drop-down or priority of payment clauses contained in this policy, this clause shall control as pertains to coverage provided by this policy under the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto.

In the event an "act of terrorism" or a "certified act of terrorism" involves nuclear reaction or radiation, or radioactive contamination, this exclusion supersedes any Nuclear Energy Liability Exclusion.

This exclusion also applies to punitive damages awarded as a part of any claim or suit seeking "bodily injury", "property damage", "personal or advertising injury" or "medical professional injury" arising, directly or indirectly, out of a "certified act of terrorism".

**III.**   The definition of "terrorism" is deleted from the **Definitions** section of your policy.

**IV.**   The following definitions are added to the **Definitions** section of your policy.

"Act of terrorism" means activities against persons, organizations or property of any nature:

**a.**   That involve the following or preparation for the following:

**(1)**   Use or threat of force or violence; or

**(2)**   Commission or threat of a dangerous act; or

**(3)**   Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**b.**   When one or both of the following applies:

**(1)**   The effect is to intimidate or coerce a government, de jure or de facto of any nation or any political division thereof, or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)**   It appears that the intent is to intimidate or coerce a government, de jure or de facto of any nation or any political division thereof, or to further political, ideological, religious, social, economic or similar objectives or to express (or express opposition to) a philosophy or ideology

    © 2006 – 2007 Arch Insurance Group, Inc.
Includes copyrighted material of Insurance
Services Office, Inc.

regardless of the amount of damage or loss.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an "act of terrorism" pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2015.   The criteria contained in the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto includes the following:

**a.**   The act resulted in insured losses in excess of $5,000,000 in the aggregate attributable to all types of insurance subject to Terrorism Risk Insurance Act; and

**b.**   The act is a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms of your policy remain unchanged.

Endorsement Number:  6

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**COVERAGE CHANGE ENDORSEMENT**

This endorsement modifies insurance provided under the following designated coverage forms:

      Healthcare Professional Liability Coverage Form
      Healthcare General Liability Coverage Form
      Healthcare General Liability Coverage Form – Claims Made
      Healthcare Provider Professional Liability Coverage Form

whichever applies.

**A.**      **Changes Applicable to All Coverage Forms**

The following is added to the **Who Is An Insured** section of your policy.

**Good Samaritan.**  Your "employees" are insureds for any "occurrence" or "medical incident" arising out of their rendering emergency first aid outside of their duties as your "employees" as long as the emergency first aid is rendered without the receipt or expectation of remuneration.

For the purpose of this Good Samaritan provision only, "medical incident" means any act or omission in the providing or failure to provide "health care professional services".  We will consider a series of related acts or omissions in the providing or failure to provide "health care professional services" to be one "medical incident".

**Medical Director.**  Your Medical Directors are covered for "medical professional injury" that results from acts or omissions in the providing of or failure to provide "health care professional services" that are performed as part of their employment duties for you.

**Blanket Additional Protected Persons.**  Other individuals or organizations when required to be covered by written contract, agreement, or permit, provided the written contract, agreement or permit is executed prior to the "claim" being made or the "suit" being brought.  Coverage is provided for them only for the work you performed or should have performed on their behalf.  They will share in your limit of liability for any covered "claim" or "suit".  Damages paid on their behalf will reduce and may exhaust your limit of liability under this policy.

**B.**      **CHANGES APPLICABLE TO ALL COMMON POLICY CONDITIONS**

The following paragraph is added to item 15. Transfer of Rights Of Recovery Against Others To Us.

We waive the right of recovery we may have against persons or organizations because of payments we make for injury or damage arising out of your ongoing operations or your work" done under a written contract  with  that  person  or  organization  and  included  in  the  "products-completed  operations hazard".  This waiver applies only when required by written contract and when such contract was executed prior to any loss.

**C.**      **Changes Applicable to Healthcare Professional Liability Coverage Form**

The following is added to Section I – Coverage.

**DAMAGE TO PATIENT'S PROPERTY**

**Section I. Coverage – 2. Additional Payments** is amended to add:

**g.**     We will pay up to $500 for loss that is due to "property damage" to your patient's tangible property if resulting directly from the performance or failure to perform "healthcare professional services".  We will make these payments regardless of fault.

These payments will not exceed $5,000 for all such losses resulting from all "healthcare professional services", regardless of the number of patients whose tangible property is injured.

For the purposes of this Additional Payment, the following changes are made:

1.     **Section IV. Deductibles** does not apply;

2.     **Section VIII – Definitions** is amended to add:

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Property damage" means:

**a.**     Physical injury to tangible property, including all resulting loss of use of that property.   All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.**     Loss of use of tangible property of others that is not physically injured.  All such loss of use shall be deemed to occur at the time of the accident, including continuous or repeated exposure to substantially the same general harmful conditions that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**MEDICAL BOARD LICENSING HEARING COST REIMBURSEMENT COVERAGE**

h.     We will reimburse the named insured for "hearing costs" which arise out of "hearings" involving physicians named in the Named Individual Or Organization Endorsement – Employed Individuals (Shared Limit) provided such "hearings" result from "medical incidents" covered by this coverage form.  We have no right or duty to defend any physician in any "hearing".

For the purposes of Medical Board Licensing Hearing Cost Reimbursement Coverage the following paragraphs are added to Section III – Limits Of Insurance

4.     Subject to the aggregate limit described in 3. above, the medical board licensing hearing cost per physician aggregate limit shown below is the most we will reimburse for all "hearing costs" covered by this endorsement regarding any one physician.

Medical Board Licensing Hearing Cost Per Physician Aggregate Limit: $20,000

5.     Subject to the medical board licensing hearing cost per physician aggregate limit shown above, the per hearing per physician limit shown below is the most we will reimburse for costs associated with any one "hearing" covered by this endorsement regarding any one physician.

Per Hearing Per Physician Limit: $10,000

For the purposes of **Medical Board Licensing** Hearing Cost Reimbursement Coverage only, the following exclusions are added to Section VI – Exclusions.

**Medical Staff Privileges** This insurance does not apply to any "hearing" arising out of or resulting from the appointment or reappointment to medical staff or the revocation or restriction of medical staff privileges by any health care facility or managed care organization.

**Completion Or Alteration Of Medical Records** This insurance does not apply to any "hearing" arising out of or resulting from disputes over timely completion or alteration of medical records.

**Fraud, Abuse, Or Non-Compliance** This insurance does not apply to any "hearing" arising out of or resulting from fraud, abuse or willful non-compliance with the rules and regulations of Medicaid or Medicare or any other program of a local, state or federal agency.

**Substance Abuse** This insurance does not apply to any "hearing" arising out of or resulting from allegations of substance abuse by the physician.

**Improper Prescriptions** This insurance does not apply to any "hearing" arising out of or resulting from allegations of improper prescription of any medication.  This includes prescriptions provided without an appropriate history or physical.

For the purposes of **Medical Board Licensing Hearing Cost Reimbursement Coverage** only, the following changes are made:

1.      **Section IV. Deductibles** does not apply;

2.      **Section VIII – Definitions** is changed to add the following:

"Hearings" means investigations conducted, or administrative proceedings or actions brought, by state medical licensing boards.

"Hearing costs" means reasonable and necessary fees and expenses of legal counsel and expert consultants, including, without limitation, investigation, travel, costs of transcripts, and court filing fees, incurred in the defense of an administrative proceeding or action.  "Hearing costs" associated with appeals are considered part of those incurred during the original proceeding.  "Hearing costs" do not include salary, charges or incidental expenses of your "employees", "administrators" or agents, or any sanctions, penalties, fines or other monetary penalties imposed by a medical licensing board.

**COVERAGE TERRITORY CHANGE (Worldwide)**

The following is added to the "Coverage Territory" definition:

c.      For any "claims" or "suits" not addressed by paragraphs **a.** or **b.** above, we will only reimburse the named insured for:

(1)     Reasonable expenses incurred by your investigation and defense.

(2)     Damages for liability incurred or settlement(s) made that are otherwise covered by this policy.

Any reimbursement made under paragraph **c.** for "claims" or "suits", including any expense associated with these "claims" or "suits", will be subject to the limit of insurance shown below and the deductibles shown in the declarations page.  You must notify us of all such "claims" or "suits" as soon as practicable.  We will have the right at our sole discretion, but not the

duty, to investigate or associate in the defense of any such "claim" or "suit". Expense associated with our defense of such "claims" will be subject to the limit of insurance shown below and the deductibles shown in the declarations page.

Aggregate Limit: $1,000,000

Each Medical Incident Limit: $1,000,000

The above limits are part of, and not in addition to, the each medical incident limit specified in the declarations.

Notwithstanding the above, the coverage territory does not include any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

**D.** Changes applicable to Healthcare General Liability Coverage Form and Healthcare General Liability Coverage Form – Claims-Made, whichever applies

**EVACUATION EXPENSE COVERAGE**

The following is added to Supplementary Payments – Coverages A and B,:

**h.** We will reimburse the insured for "evacuation expenses" actually incurred in connection with an "evacuation" which first takes place during the Policy Period and which is reported in accordance with the **Duties in the Event an Evacuation Occurs** section of this endorsement, subject to the sublimit shown below.

Evacuation Sublimit of Insurance

Annual Aggregate Evacuation Expense Limit: $50,000

Each "Claim" Evacuation Expense Limit: $50,000

The annual aggregate evacuation expense limit shown above is the maximum we will pay for all expenses in any way related to, in whole or in part, "evacuation expense".

Subject to the annual aggregate evacuation expense limit, the each "claim" evacuation expense limit shown above is the maximum we will pay for expenses for any one "claim" in any way related to, in whole or in part, "evacuation expense".

The above limits are part of, and not in addition to, the aggregate limit applicable to this coverage form.

For the purposes of **Evacuation Expense Coverage**, no coverage will be available for "evacuation expenses" arising out of any:

a. strike or bomb threat, unless the "evacuation" was ordered by a civil authority;

b. false fire alarm or a planned evacuation drill;

c. vacating of one or more residents because of their individual medical condition;

d. nuclear reaction, radiation or any radioactive contamination, however caused;

e. seizure or destruction of property by order of a governmental authority; provided that this Exclusion shall not apply to an order of evacuation by a governmental authority due to a

condition described above; or

f.   war, including undeclared or civil war, warlike action by a military force, insurrection, rebellion or revolution.

"Evacuation" means the removal of all or the majority of residents from one or more of your locations or facilities in response to an actual or threatened, natural or man-made condition, that is unexpected and unforeseen and, causes the residents of such location or facility to be in imminent danger of loss of life or physical harm.

Such condition must be in the form of an emergency or sudden crisis requiring immediate action, and not the result of a latent or hidden condition at the location or facility.

"Evacuation expenses" means reasonable costs and expenses actually incurred by you in connection with the "evacuation", including the costs associated with transporting and lodging residents who have been evacuated.  "Evacuation expenses" shall not include any remuneration, salaries, overhead, fees or benefit expenses of the Named Insured or any Insured.

**Duties in the Event an Evacuation Occurs**

1.   Any "evacuation" shall be reported to us as soon as practicable, but in no event later than thirty (30) days after you first incur "evacuation expenses" for which coverage will be requested, or thirty (30) days after the expiration date of your policy, or whichever is earlier.

2.   You are not required to obtain our prior written approval or consent before incurring any "evacuation expenses".

**E.   Changes applicable to Healthcare Professional Liability Coverage Form; Healthcare General Liability Coverage Form; and Healthcare General Liability Coverage Form – Claims-Made, whichever applies**

The **Abuse or Molestation** exclusion is deleted from the **Exclusions** section of your policy.

The following is added to **Section I – Coverages, 1. Insuring Agreement** of the **Healthcare Professional Liability Coverage Form**, **Section I – Coverages, Coverage A Bodily Injury and Property Damage Liability**, **1. Insuring Agreement** of the **Healthcare General Liability Coverage Form**, and **Section I – Coverages, Coverage A Bodily Injury and Property Damage Liability**, **1. Insuring Agreement** of the Healthcare General Liability Coverage Form – Claims-Made.

We will defend any "claim" in any way related to, in whole or in part, "abuse or molestation", provided that no insured, other than the alleged perpetrator and/or victim, knew about or could have reasonably foreseen or discovered the event which gave rise to such "claim".  We will also pay amounts that any insured becomes legally required to pay as damages.

The defense provided and damages paid under this coverage are subject to the abuse or molestation limits of insurance shown below.  Defense expenses and damages paid will reduce and may exhaust the limits of insurance as shown in the declarations.

Annual Aggregate Abuse Or Molestation Limit: $2,000,000

Each "Claim" Abuse Or Molestation Limit: $1,000,000

The annual aggregate abuse or molestation limit shown above is the maximum we will pay for all "claims" in any way related to, in whole or in part, "abuse or molestation", including the defense expense related to

such "claims". This limit is part of, and not in addition to, the aggregate limit or the general aggregate limit specified in the declarations, whichever applies.

Subject to the annual aggregate abuse or molestation limit, the each "claim" abuse or molestation limit shown above is the maximum we will pay for any one "claim" in any way related to, in whole or in part, "abuse or molestation", including the defense expense related to such "claims". This limit is part of, and not in addition to, the each medical incident limit or the each occurrence limit, whichever applies, specified in the declarations.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:  7

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**KNOWN ACCIDENT, OCCURRENCE, MEDICAL INCIDENT, CLAIM OR SUIT EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

All coverage forms included in this policy.

The accident, occurrence, medical incident, claim or suit listed below is excluded from coverage under this policy.

| Date of the accident, occurrence, medical incident claim or suit: | Description of the accident, occurrence, medical incident claim or suit: |
|---|---|
| Any | All claims involving the use of Kryptonite |

All other terms of your policy remain unchanged.

Endorsement Number: 8

Policy Number: FLP0054437-03

Named Insured: Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: April 15, 2016



## HEALTHCARE PROFESSIONAL LIABILITY COVERAGE DECLARATIONS

This coverage declarations shows the limits of insurance and deductibles that apply to your Healthcare Professional Liability Coverage.

**LIMITS OF INSURANCE**

| | |
|---|---|
| Aggregate Limit: | $4,000,000 |
| Each Medical Incident Limit: | $2,000,000 |

**DEDUCTIBLES**

| | |
|---|---|
| Each Medical Incident Deductible: | $0 |
| Aggregate Deductible: | $0 |

*If no Aggregate Deductible is shown, you will be responsible for the deductibles described above without further limitation.*

**Retroactive Date:** 11/01/2006

*If this policy provides coverage to more than one insured and they maintain different retroactive dates, they will be named with their respective retroactive dates on a separate Named Insured And Retroactive Date endorsement.*

## HEALTHCARE PROFESSIONAL LIABILITY COVERAGE FORM

THIS FORM PROVIDES CLAIMS-MADE AND REPORTED COVERAGE.  "Claims" must first be made against the insured and reported to the company in writing during the policy period unless an extended reporting period applies.

PLEASE READ THE ENTIRE FORM CAREFULLY.

**POLICY INDEX**

| | | |
|---|---|---|
| Insuring Agreement | Page | 1 |
| Who Is An Insured | Page | 3 |
| Limits Of Insurance | Page | 4 |
| Deductibles | Page | 4 |
| Extended Reporting Period | Page | 5 |
| Exclusions | Page | 6 |
| Other Insurance | Page | 9 |
| Definitions | Page | 9 |

Various provisions in the policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the named insured shown in the introduction, and any other person or organization qualifying as a named insured under this policy.  The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under **Section II – Who Is An Insured.**

Other words and phrases that appear in quotation marks have special meaning.  Refer to **Section VIII – Definitions**.

**SECTION I – COVERAGE**

1. **Insuring Agreement**

   a. We will pay those amounts that the insured becomes legally required to pay as damages because of "medical professional injury" that results from acts or omissions in the providing of or failure to provide "health care professional services" by or for an insured.

   b. This coverage applies to "medical professional injury" only if:

      (1) The injury is caused by a "medical incident" that takes place in the "coverage territory";

      (2) The "medical incident" occurred on or after the "retroactive date" shown in the declarations and before the end of the policy period ; and

(3) A "claim" with respect to the "medical professional injury", is first made against any insured and reported to us in writing, in accordance with **Paragraph d.** below, during the policy period or an extended reporting period we provide in accordance with **Section V – Extended Reporting Period**.

But this coverage does not apply to any "claim" that any insured knew about or could have reasonably foreseen or discovered before the "original inception date" of this coverage.

If an insured is added to this policy at any date subsequent to the date this policy first became effective for any insured, we will not cover any "claim" that results from the activities or business of this subsequently added insured if any insured knew about or could have reasonably foreseen, prior to the first date this policy applies to the subsequently added insured, that a "claim" could result from such activities or business.

c. We will have the right and duty to defend the insured against any "claim" for damages. We will do so even if any of the allegations of the "claim" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "claim" seeking damages for injury to which this insurance does not apply. We may, at our discretion, investigate any "medical incident" and settle any "claim" that may result. But:

(1) The amount we will pay for damages is limited as described in **Section III – Limits of Insurance**; and

(2) Our right and duty to defend will end when we have used up the applicable limit of insurance in payment of judgments or settlements.

No other obligation or liability to pay sums or perform other acts or services is covered unless explicitly provided for under **Paragraph 2 – Additional Payments** below.

d. A "claim" shall be considered to be first made at the earlier of the following times:

(1) When notice of such "claim" is received by any insured.

(2) When you knew about or should reasonably have known a circumstance was likely to result in a "claim".

(3) When a "claim" is reported in writing directly to us or one of our agents.

A "claim" received by the insured and reported to us in writing within thirty (30) days after the end of the policy period will be deemed to have been reported on the last day of the policy period if no subsequent policy is available to cover the "claim".

You must report the "claim", "suit" or "medical incident" in accordance with the terms and conditions of the endorsement Your Duties In The Event Of A Medical Incident, Claim or Suit which is a part of this policy.

e. All "claims" arising out of the same "medical incident" will be deemed to have been made at the time of the first of those "claims" made against any insured. Only the policy in effect when the first such related "claim" is made and reported to us in writing will apply to all such related "claims" no matter when those related "claims" are made or reported. If the first such "claim" is made prior to the effective date of this policy, this policy will not apply to that "claim" nor to any related "claim" made during this policy period or any extended reporting period we provide in accordance with **Section V – Extended Reporting Period.**

**2. Additional Payments**

We will pay, with respect to any "claim" we investigate or settle or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance.  We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" including actual loss of earnings up to $500 a day because of time off work.

**d.** All costs taxed against the insured in the "suit".

**e.** Prejudgment interest awarded against the insured on that part of the judgment we pay.  If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**f.** All interest on the full amount of the judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.  Our duty to make these payments will end when we have used up the limits of insurance that apply with the payment of judgments or settlements.

We will have the right to appeal a judgment for "medical professional injury" in any "suit" we defend.  If we appeal such a judgment, we will pay all expenses which result directly from that appeal.  This includes any taxed costs and postjudgment interest.  These appeal expenses are in addition to the limits of insurance.  The results of an appeal will not change the limits of insurance that apply under this coverage form.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the introduction as:

**a.** An individual, you are an insured, but only with respect to the provision of "health care professional services" by or for you.

**b.** A partnership or joint venture, you are an insured but only with respect to the provision of "health care professional services" by or for you.  Your partners or co-venturers are also insureds, but only with respect to that partner's or co-venturer's  liability as such.

**c.** A limited liability company, you are an insured but only with respect to the provision of "health care professional services" by or for you.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers.

**d.** A corporation or other organization, you are an insured but only with respect to the provision of "health care professional services" by or for you.  Your "executive officers", directors, trustees and governors are insureds, but only with respect to their duties as your "executive officers", directors, trustees or governors.  Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.**   A trust, you are an insured but only with respect to the provision of "health care professional services" by or for you.  Your trustees are also insureds, but only with respect to their duties as trustees.

**2.**   Your "employees", students and "volunteer workers" are insureds, but only for acts or omissions within the course and scope of their duties for you or while performing duties related to the conduct of your business.

**3.**   If an insured dies or is adjudged incompetent, this insurance will terminate for that insured.  But the insured's legal representative will be an insured for any "medical incident" previously committed and covered by this policy.

**4.**   Your "administrators" are insureds, but only for their duties as your "administrators".

**5.**   Persons performing services on or for your formal review boards or committees are insureds, but only while performing covered services required or requested by such boards or committees.

**6.**   Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as an insured if there is no other similar insurance available to that organization. However, coverage under this provision is afforded only until the ninetieth (90th) day after you acquire or form the organization or the end of the policy period, whichever is earlier and provided further that coverage does not apply to "medical professional injury" that results from a "medical incident" that occurred before you acquired or formed the organization.  The "retroactive date" of coverage for the newly formed or acquired organization will be the date of acquisition or formation unless we agree, in writing, to a different "retroactive date".

However, no nurse midwife, intern, extern, resident, or dental, osteopathic or medical doctor is an insured for any "medical professional injury" that results from acts or omissions in the providing of or failure to provide "health care professional services".

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a named insured in the introduction.

## SECTION III – LIMITS OF INSURANCE

**1.**   The limits of insurance shown in the declarations and the rules below fix the most we will pay regardless of the number of:

**a.**   Insureds;

**b.**   "Claims" made; or

**c.**   Persons or organizations making "claims".

**2.**   The aggregate limit is the most we will pay for the sum of all damages because of all "medical professional injury".

**3.**   Subject to the aggregate limit, the each medical incident limit is the most we will pay for all damages because of all "medical professional injury" arising out of any one "medical incident".

**a.**   We will consider a series of related acts or omissions in the providing of or failure to provide "health care professional services" to be one "medical incident".

    **b.**    All "claims" arising out of the same "medical incident" will be deemed to be a single "claim" and to have been made at the time the first of those "claims" was made against any insured.

            Only the policy in effect when the first such related "claim" is made and reported to us in writing will apply to all such related "claims" no matter when those related "claims" are made or reported.

The limits of insurance apply to the policy period set forth in the introduction or any endorsement thereto.

If the aggregate limit is left blank in the declarations, the aggregate limit will be considered to be three times the each medical incident limit.

If you change your limits of insurance under this insurance the new limits do not apply to:

    **a.**    Any "claim" that was made or brought against any insured; or

    **b.**    Any "claim" that any insured reasonably knew about or should have reasonably known about

before the effective date of the limits change.

## SECTION IV – DEDUCTIBLES

**1.**    Our obligation under this insurance to pay damages for any covered "medical incident" on your behalf applies only to the amount of damages in excess of the deductible amount stated in the declarations.  The deductible shown in the declarations and the rules below fix the amount of damages over which the limits of insurance will apply regardless of the number of:

    **a.**    Insureds;

    **b.**    "Claims" made; or

    **c.**    Persons or organizations making "claims".

The each medical incident deductible is the amount that will be your responsibility for all damages arising out of any one "medical incident".

The aggregate deductible is the amount that will be your responsibility for all damages that are first reported during the policy period.  If no aggregate deductible is shown, you will be responsible for the each medical incident deductible without further limitation.

The deductible does not apply to any **Additional Payments**.

**2.**    The terms of this insurance, including those with respect to:

    **a.**    Our right and duty to defend you against any "claim", and

    **b.**    Your duties in the event of a "medical incident", "claim", or "suit"

apply irrespective of the application of the deductible amount.

**3.**    We may pay any part or all of the deductible amount to effect settlement of a "claim" or "suit" and, upon notification of the action taken, you shall reimburse us within thirty (30) days of the notification for such part of the deductible amount as has been paid by us.

**SECTION V – EXTENDED REPORTING PERIOD**

**1.**     You will have the right to purchase an extended reporting period, as described below, if:

    **a.**     This coverage form is canceled or not renewed; or

    **b.**     We renew or replace this coverage form with insurance that:

        **(1)**     Has a "retroactive date" later than the "retroactive date" shown in the declarations of this coverage; or

        **(2)**     Does not apply to "medical professional injury" on a claims-made basis.

**2.**     Extended Reporting Period

    **a.**     An extended reporting period is available, but only by endorsement and for an additional charge.  The extended reporting period purchased by you is indicated in the Extended Reporting Period Endorsement.

    **b.**     The extended reporting period starts with the end of the policy period.  It does not extend the policy period, change the scope of coverage provided under this coverage form, or reinstate or increase the limits of insurance available under this coverage form.  It applies only to "medical professional injury" caused by a "medical incident" which occurred on or after the "retroactive date" shown in the declarations and before the end of the policy period provided a "claim" for such "medical professional injury" is first made or brought and reported to us in writing during the extended reporting period.

    **c.**     You must notify us in writing of your intent to purchase the extended reporting period within thirty (30) days after the end of the policy period or the date of termination of the policy, whichever comes first.

    **d.**     The extended reporting period will not go into effect unless the premium for this policy is paid in full and you pay the additional premium for the Extended Reporting Period Endorsement promptly when due.  Once in effect, the extended reporting period may not be canceled and the entire premium becomes fully earned.

    **e.**     If an Extended Reporting Period Endorsement is issued, its premium will be calculated using the rates and rules in effect when the extended reporting period begins.

    **f.**     The insurance provided under the extended reporting period endorsement will be excess over any other valid and collectible insurance available to the insured, whether primary, excess, contingent or on any other basis, whose policy period begins or continues after the endorsement takes effect.

**SECTION VI – EXCLUSIONS**

This insurance does not apply to any "claim" that alleges:

**1.**     **Abuse Or Molestation**

    Injury or damage that is in any way related to, in whole or in part, "abuse or molestation".  We will, however, defend such "claim" provided that no insured, other than the alleged perpetrator and/or victim, knew about or could have reasonably foreseen or discovered the event which gave rise to such "claim".  Our duty to pay expenses will end when we have paid an amount equal to the each

occurrence limit of insurance shown in the declarations.

**2.     Violation Of An Antitrust Law**

Injury or damage for damages arising out of the violation of an antitrust law.

**3.     Aircraft, Auto, Mobile Equipment Or Watercraft**

Injury or damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto", "mobile equipment" or watercraft.  Use includes operation and loading or unloading.

However, this exclusion does not apply to loading or unloading of patients.

**4.     Asbestos**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from the "asbestos hazard".

This exclusion includes but is not limited to compliance with any request, demand, order, or statutory or regulatory requirement, or any other action authorized or required by law, or any other "claim", demand, loss, cost or expense arising out of, relating to or resulting from the investigation of, abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "asbestos", as well as any costs, fees, expenses, penalties, judgments, fines or sanctions arising or resulting therefrom or relating thereto.

As used in this exclusion, "asbestos hazard" means:

**a.**     The actual, alleged or threatened exposure to, consumption of, ingestion of, inhalation of, absorption of, existence of, or presence of, "asbestos" in any manner or form whatsoever, either directly or indirectly;

**b.**     The actual or alleged failure to warn, advise or instruct related to "asbestos" in any manner or form whatsoever;

**c.**     The actual or alleged failure to prevent exposure to "asbestos" in any manner or form whatsoever;

**d.**     The actual or alleged presence of "asbestos" in any manner or form whatsoever, in any place whatsoever, whether or not within a building or structure, including its contents.

As used in this exclusion, "asbestos" means any substance, regardless of its form or state, containing asbestos.

**5.     Contractual Liability**

Injury or damage for which the insured is obligated to pay damages by reason of the assumption of liability in a written contract or agreement.  This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement including "medical professional injury" resulting from "health care professional services".

**6.     Criminal Acts**

Injury or damage arising out of a criminal act, including but not limited to "abuse or molestation" or

fraud, committed by or at the direction of the insured.

**7.** **Dishonest, Fraudulent, Malicious, Uninsurable Acts**

Injury or damage arising out of any dishonest, fraudulent or malicious act, including reckless violation of any statute, or any act deemed uninsurable by law, committed by any insured.

**8.** **Directors And Officers**

Any "wrongful act" of any of your directors or officers in the discharge or performance of their duties as such.

**a.** Any "claim" for damages against any corporation brought by any director or officer for indemnification or to be reimbursed for; or

**b.** Any damages to which any director or officer is or was a party to which is based on a "wrongful act".

For the purposes of this exclusion, "wrongful act" means any actual or alleged error, misstatement, misleading statement, act or omission, neglect, or breach of duty while acting in the capacity of a director or officer.

This exclusion does not apply to "medical professional injury".

**9.** **Employers' Liability**

Injury or damage to:

**a.** An "employee" of the insured arising out of and in the course of:

**(1)** Employment by the insured; or

**(2)** Performing duties related to the conduct of the insured's business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of **Paragraph a.** above.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligations to share damages with or repay someone else who must pay damages because of the injury.

**10.** **Employment-Related Practices**

**a.** Injury or damage resulting from:

**(1)** Refusal of employment;

**(2)** Termination of employment; or

**(3)** Employment-related practices, policies, acts or omissions including coercion, demotion, evaluation, reassignment, discipline, false imprisonment, invasion of rights

to privacy, infliction of emotional distress, defamation, harassment, humiliation or discrimination.

    **b.**    Any "claim" from the spouse, child, parent, brother or sister as a consequence of such injury or damage.

**11.**    **E.R.I.S.A.**

Injury or damage for any violation or alleged violation of the Employee Retirement Income Security Act of 1974 or any amendment or addition to this act or similar provisions of any federal, state or local law.

**12.**    **Non-Monetary Damages**

Injury or damage for non-monetary damages.

**13.**    **Nuclear Energy Liability**

    **a.**    Injury or damage for which any insured is also protected under a nuclear energy liability insurance policy or would have been protected under such a policy if that policy's limits of insurance had not been used up.

    **b.**    Injury or damage that results from the "hazardous property" of "nuclear material" and for which:

        **(1)**    Any insured is required by law to maintain financial protection in accordance with the federal Atomic Energy Act, or any of its amendments; or

        **(2)**    Any insured is entitled, or would have been entitled had this insurance not been issued, to indemnity from the United States government, or any of its agencies, under any contract or agreement between the government, or any of its agencies, and any insured.

    **c.**    Injury or damage that results from the "hazardous properties" of "nuclear material" when:

        **(1)**    The "nuclear material" is located at, or at any time discharges or disperses from, a "nuclear facility" which is or was at any time owned by any insured, or operated by or for any insured;

        **(2)**    The "nuclear material" is contained in "spent nuclear fuel" or "nuclear waste" that is or was at any time possessed, handled, used, processed, stored, transported, or disposed of by or for any insured; or

        **(3)**    The "claim" results from the furnishing by any insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility".

**14.**    **Other Coverage Forms**

Injury or damage which is covered under any other coverage form attached to this policy, unless otherwise stated.

**15.**    **Pollution**

    **a.**     Injury or damage resulting from the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

    **b.**     Injury or damage cost or expense resulting from:

        **(1)**     Any request, demand or order that any insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

        **(2)**     Any "claim" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

**16.**   **Terrorism**

Injury or damage that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with an "act of terrorism", including action in hindering, controlling, preventing, suppressing, retaliating against, responding to or defending against an actual or expected "act of terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

This exclusion also applies to an "act of terrorism" that:

    **a.**     Is carried out by means of dispersal or application of radioactive material or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination;

    **b.**     Involves radioactive material that is released and it appears that one purpose of the "act of terrorism" was to release such material;

    **c.**     Involves the use, release, or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination;

    **d.**     Is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

    **e.**     In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

In the event an "act of terrorism" involves nuclear reaction or radiation, or radioactive contamination, this exclusion supersedes any Nuclear Energy Liability Exclusion.

**17.**   **War**

Injury or damage that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with:

    **a.**     War, including undeclared or civil war;

    **b.**     Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    **c.**     Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority

in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**18.    Workers Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**SECTION VII – OTHER INSURANCE**

This insurance is excess of any other valid and collectible insurance available to you whether that insurance is stated to be primary, pro-rata, contributory, excess, contingent or otherwise, unless that insurance specifically applies as excess insurance over this coverage form.

**SECTION VIII – DEFINITIONS**

1.    "Abuse or molestation" includes but is not limited to any physical, mental, or moral harassment, assault or intimacy of a sexual nature even if consensual.

2.    "Act of terrorism" means activities against persons, organizations or property of any nature:

    **a.**    That involve the following or preparation for the following:

        **(1)**    Use or threat of force or violence;

        **(2)**    Commission or threat of a dangerous act; or

        **(3)**    Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

    **b.**    When one or both of the following applies:

        **(1)**    The effect is to intimidate or coerce a government, de jure or de facto of any nation or any political division thereof, or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

        **(2)**    It appears that the intent is to intimidate or coerce a government, de jure or de facto of any nation or any political division thereof, or to further political, ideological, religious, social, economic or similar objectives or to express (or express opposition to) a philosophy or ideology

    regardless of the amount of damage or loss.

3.    "Administrators" means any administrator, superintendent or chief executive officer, chief operating officer, chief financial officer, medical director, department head or staff member that performs administrative duties for you.

4.    "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment.

5.    "Claim" means a demand which seeks damages, any circumstance which is likely to result in a demand for damages, or "suit".

However, we will not consider a patient incident report, variance report, or any other report, made for loss prevention purposes, to be a "claim", even if you send it to us or one of our agents.

6.  "Coverage territory" means:

    a.  The United States of America (including its territories and possessions), Puerto Rico and Canada; and

    b.  All parts of the world if the insured's responsibility to pay damages is determined in a "claim" in the territory described in **Paragraph a.** above or in a settlement we agree to.

    However, the coverage territory does not include any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

7.  "Employee" includes a "leased worker".  "Employee" does not include "temporary worker".

8.  "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

9.  "Hazardous properties" include radioactive, toxic or explosive properties.

10. "Health care professional services" means:

    a.  Medical, surgical, dental, x-ray, nursing, mental, or other similar "health care professional services" or treatments;

    b.  Providing or dispensing of food, beverages, medications or medical supplies or appliances in connection with services described in **Paragraph a.** above;

    c.  Handling or treatment of dead bodies, including autopsies, organ donation or harvesting, or other procedures;

    d.  The work of your formal accreditation, standards review or equivalent professional board or committee, done for any insured while:

        (1)  Evaluating the professional qualifications or clinical performance of any provider of "health care professional services"; or

        (2)  Promoting and maintaining the quality of "health care professional services" being provided; and

    e.  The execution, or failure to execute, a decision or directive of your formal accreditation, standards review or equivalent professional board or committee.

11. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12. "Medical incident" means any act or omission in the providing of or failure to provide "health care professional services" to your patients that results in "medical professional injury".  We will consider a series of related acts or omissions in the providing of or failure to provide "health care professional services" to be one "medical incident".

13. "Medical professional injury" means injury, including death, to others that results from acts or

omissions in the providing of or failure to provide "health care professional services" by or for an insured.

**14.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **b.** Vehicles maintained for use solely on or next to premises you own or rent;

    **c.** Vehicles that travel on crawler treads;

    **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **(1)** Power cranes, shovels, loaders, diggers or drills; or

        **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

    **e.** Vehicles not described in **Paragraphs a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        **(2)** Cherry pickers and similar devices used to raise or lower workers;

    **f.** Vehicles not described in **Paragraphs a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

        **(1)** Equipment designed primarily for:

            **(a)** Snow removal;

            **(b)** Road maintenance, but not construction or resurfacing; or

            **(c)** Street cleaning;

        **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**15.** "Nuclear facility" means any "nuclear reactor", "uranium isotopes separation device or equipment", "special nuclear material device or equipment", or "nuclear waste site". "Nuclear facility" includes the site on which it is located, all operations conducted on such site, and all premises used for such operations.

16. "Nuclear reactor" means any device, equipment, or machine designed or used to:

   a. Sustain nuclear fission in a self-supporting chain reaction; or

   b. Contain a critical mass of fissionable material.

17. "Nuclear material" means any of the following materials which are defined in the federal Atomic Energy Act, or any of its amendments:

   a. Source material;

   b. Special nuclear material; or

   c. By-product material.

18. "Nuclear waste site" means any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "nuclear waste".

19. "Nuclear waste" means any waste material that contains by-product material and results from the operation of any "nuclear reactor", or "uranium isotopes separation device or equipment", by any insured. "Nuclear waste" does not include tailings or wastes that result from the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.

20. "Original inception date" means the beginning date of the earliest insurance from which we have continuously provided protection for this coverage form.

21. "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

22. "Retroactive date" means the date shown in your declarations on or after which any "medical incident" must have occurred in order for coverage under this insurance to apply. If no "retroactive date" is shown, the "retroactive date" is the same as the inception date of this coverage form.

23. "Special nuclear material device or equipment" means any device or equipment used for the processing, fabricating, or alloying of special nuclear material if the total amount of such material is at any time in the custody of any insured at the premises where the device or equipment is located and is more than 25 grams of plutonium or uranium 233, or any combination of those two materials; or is more than 250 grams of uranium 235.

24. "Spent nuclear fuel" means any solid or liquid fuel element or component that has been exposed to radiation or used in a "nuclear reactor".

25. "Suit" means a civil proceeding in which damages because of "medical professional injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; and

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

26. "Temporary worker" means a person who is furnished to you to substitute for a permanent

"employee" on leave or to meet seasonal or short-term workload conditions.

27.    "Uranium isotopes separation device or equipment" means any device or equipment designed or used for separating the isotopes of uranium or plutonium; processing or utilizing "spent nuclear fuel"; or handling, processing or packaging "nuclear waste".

28.    "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

**NET PROTECTION PLUS/REGULATORY DEFENSE PLUS COVERAGE**

**NOTICE TO POLICYHOLDER**

This Endorsement contains Insuring Agreements A through H.  Unless an Insuring Agreement in this Endorsement states otherwise, this Endorsement provides claims-made and reported coverage, meaning coverage applies only to "claims" first made against an "insured" during the policy period and reported to us during the policy period unless an Extended Reporting Period applies.  Various provisions in this Endorsement restrict coverage.  Read the entire Endorsement carefully to determine rights, duties and what is and is not covered.

All terms, exclusions, conditions and definitions contained in this Endorsement pertain only to the coverage provided by this Endorsement.

The limits for the coverage provided under this Endorsement are specified in Section III – Limits of Insurance.  Such limits of liability are in addition to, and will not erode, the limits provided elsewhere in the policy.  "Defense costs" paid under this Endorsement will erode the limits set forth in Section III – Limits of Insurance.

**SECTION I – INSURING AGREEMENTS**

**A.**    <u>**Multimedia Liability**</u>: We agree to pay all amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which an "Insured" becomes legally obligated to pay as "loss", including liability "assumed under contract", and related "defense costs", due to a "claim" for a "multimedia peril", provided that:

    **1.**    such "claim" is first made against the "Insured" during the policy period or the Extended Reporting Period, if applicable;

    **2.**    such "claim" is reported to us during the policy period or the Extended Reporting Period, if applicable, subject to Section IV.A.; and

    **3.**    the "multimedia peril(s)" takes place or first commences on or after the "retroactive date".

**B.**    <u>**Security and Privacy Liability**</u>: We agree to pay all amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which an "insured" becomes legally obligated to pay as "loss", and related "defense costs", due to a "claim" for a "security and privacy wrongful act", provided that:

    **1.**    such "claim" is first made against the "insured" during the policy period or the Extended Reporting Period, if applicable;

    **2.**    such "claim" is reported to us during the policy period or the Extended Reporting Period, if applicable, subject to Section IV.A.; and

    **3.**    the "security and privacy wrongful act(s)" takes place or first commences on or after the "retroactive date"

**C.**    <u>**Privacy Regulatory Defense and Penalties**</u>: We agree to pay all amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which an "insured" becomes legally obligated to pay as "regulatory fines and penalties" and/or a "regulatory compensatory award", and related "defense costs", due to a "claim" resulting from a "security breach" or "privacy breach",

provided that:

1.  such "claim" is first made against the "insured" during the policy period or the Extended Reporting Period, if applicable;

2.  such "claim" is reported to us during the policy period or the Extended Reporting Period, if applicable, subject to Section IV.A.; and

3.  the "security breach" or "privacy breach" takes place or first commences on or after the "retroactive date".

**D.   Privacy Breach Response Costs, Patient Notification Expenses and Patient Support and Credit Monitoring Expenses**: We agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which the "named insured" incurs as "privacy breach response costs", "patient notification expenses" and/or "patient support and credit monitoring expenses" during the policy period as a direct result of an "adverse media report", "security breach" or "privacy breach", provided that:

1.  such "claim" is first made by the "named insured" during the policy period or the Extended Reporting Period, if applicable;

2.  the "adverse media report", "security breach" or "privacy breach" takes place or first commences on or after the "retroactive date"; and

3.  the "adverse media report", "security breach" or "privacy breach" is reported to us no later than sixty (60) days from the date an "insured" first discovers the "adverse media report", "security breach" or "privacy breach".

**E.   Network Asset Protection:**

1.  **Loss of Digital Assets:**

    We agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which the "named insured" incurs as "digital assets loss" and/or "special expenses" during the policy period due to a "covered cause of loss" which directly causes damage, alteration, corruption, distortion, theft, misuse or destruction of "digital assets", provided tha:

    a.  a "claim" is first made by the "named insured" during the policy period or the Extended Reporting Period, if applicable;

    b.  the damage, alteration, corruption, distortion, theft, misuse or destruction of "digital assets" is directly caused by a "covered cause of loss" that takes place or first commences during the policy period;

    c.  the "named insured" provides clear evidence that the "digital assets loss" and/or "special expenses" directly resulted from a "covered cause of loss"; and

    d.  the "covered cause of loss" is reported to us no later than sixty (60) days from the date an Insured first discovers the "covered cause of loss".

    We will pay "digital assets loss" and/or "special expenses" for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of the "digital assets".

    **2.**    **Non-Physical Business Interruption and Extra Expense:**

We agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which the "named insured" incurs as "income loss", "interruption expenses" and/or "special expenses" during the "period of restoration", but after the "waiting period", due to a "covered cause of loss" which directly causes a total or partial interruption, degradation in service or failure of the "insured's computer system", provided that:

    **a.**    a "claim" is first made by the "named insured" during the policy period or the Extended Reporting Period, if applicable;

    **b.**    the total or partial interruption, degradation in service or failure of the "insured's computer system" is directly caused by a "covered cause of loss" that takes place or first commences during the policy period;

    **c.**    the "named insured" provides clear evidence that the "income loss", "interruption expenses" and/or "special expenses" directly resulted from a "covered cause of loss"; and

    **d.**    the "covered cause of loss" is reported to us no later than sixty (60) days from the date the "insured" first discovers the "covered cause of loss".

**F.**    **Cyber Extortion**: We agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which the "named insured" incurs as "cyber extortion expenses" and/or "cyber extortion monies" due to a of a "cyber extortion threat", provided that:

    **1.**    such "cyber extortion threat" is first made against an "insured" during the policy period or the Extended Reporting Period, if applicable;

    **2.**    such "cyber extortion threat" is reported to us no later than sixty (60) days from the date the "cyber extortion threat" is made against an "insured"; and

    **3.**    such "named insured" provides clear evidence that the "cyber extortion expenses" and/or "cyber extortion monies" directly resulted from a "cyber extortion threat".

We will not pay "cyber extortion expenses" and/or "cyber extortion monies" that are incurred without our prior consultation and written authorization. You must make every reasonable effort to notify local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any "cyber extortion monies" in response to a "cyber extortion threat".

**G.**    **Cyber Terrorism**: We agree to pay all reasonable amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which the "named insured" incurs as "income loss", "interruption expenses" and/or "special expenses" during the "period of restoration", but after the "waiting period", due to an "act of terrorism" which directly causes a total or partial interruption, degradation in service or failure of the "insured's computer system", provided that:

    **1.**    a claim is first made by the "named insured" during the policy period or the Extended Reporting Period, if applicable;

    **2.**    the total or partial interruption, degradation in service or failure of the "insured's computer system" is directly caused by an "act of terrorism" that takes place or first commences during the policy period;

3.  the "named insured" provides clear evidence that the "income loss", "interruption expenses" and "special expenses" directly resulted from an "act of terrorism";

4.  the "act of terrorism" is reported to us no later than sixty (60) days from the date the "insured" first discovers the "act of terrorism"; and

**H.  Regulatory Defense PLUS Coverage**: We agree to reimburse an "insured" for all amounts within the applicable limit of insurance set forth in Section III – Limits of Insurance which an "insured" becomes legally obligated to pay as "regulatory fines and penalties" and/or which an "insured" incurs as "defense costs" and "shadow audit expenses" because of a "claim", provided that:

1.  such "claim" is first made against the "insured" during the policy period or the Extended Reporting Period, if applicable;

2.  such "claim" is reported to us during the policy period or the Extended Reporting Period, if applicable; and

3.  such "claim" arises out of an act, error or omission, or a series of acts, errors or omissions, that takes place or first commences on or after the "retroactive date".

## SECTION II – WHO IS AN INSURED

Each of the following is an "insured" under this Endorsement to the extent set forth below:

1.  Each and every "named insured";

2.  Any executive officer, partner, administrator, stockholder or member of the board of directors, trustees or governors of the "named insured", but only while acting within the course and scope of their duties on behalf of the "named insured";

3.  Any full-time or part-time "employee" of the "named insured", but only while acting within the course and scope of their duties on behalf of the "named insured"; and

4.  Any independent contractor of the "named insured", but only while acting within the course and scope of their duties on behalf of the "named insured".

## SECTION III – LIMITS OF INSURANCE

**A.  Coverage Limits**

1.  With respect to the coverage provided under this Endorsement, the Limits of Liability are as follows:

|   | Insuring Agreements | Each Claim Limit of Liability |
|---|---|---|
| A | Multimedia Liability | $50,000 |
| B | Security and Privacy Liability | $50,000 |
| C | Privacy Regulatory Defense and Penalties | $50,000 |
| D | Privacy Breach Response Costs, Patient Notification Expenses, and Patient Support and Credit Monitoring Costs | $50,000 |
| E | Network Asset Protection | $50,000 |
| F | Cyber Extortion | $50,000 |

| | | |
|---|---|---|
| G | Cyber Terrorism | $50,000 |
| H | Regulatory Defense PLUS | $50,000 |
| | Annual Aggregate Limit of Liability | $50,000 |

| | | |
|---|---|---|
| | Retroactive Date | 11/01/2006 |

**2.    Each Claim Limit of Liability**

   **a.**    Our Limit of Liability for each "claim" under this Endorsement will not exceed the Each Claim Limit of Liability stated in paragraph 1 above.

   **b.**    We will not be obligated to pay, undertake or continue the defense of any "claim" after such Each Claim Limit of Liability has been tendered into court or exhausted by payment of "loss", "defense costs", "shadow audit expenses", "regulatory compensatory awards", "regulatory fines and penalties", "privacy breach response costs", "patient notification expenses", "patient support and credit monitoring expenses", "digital assets loss", "special expenses", "income loss", "interruption expenses", "cyber extortion expenses" or "cyber extortion monies".

**3.    Annual Aggregate Limit of Liability**

   **a.**    Our maximum liability for all claims under this Endorsement will not exceed the Annual Aggregate Limit of Liability stated in paragraph 1. above.

   **b.**    We will not be obligated to pay, undertake or continue the defense of any "claim" after the Annual Aggregate Limit of Liability has been tendered into court or exhausted by payment of "loss", "defense costs", "shadow audit expenses", "regulatory compensatory awards", "regulatory fines and penalties", "privacy breach response costs", "patient notification expenses", "patient support and credit monitoring expenses", "digital assets loss", "special expenses", "income loss", "interruption expenses", "cyber extortion expenses" or "cyber extortion monies".

**B.    Related Claims**

   **1.**    With respect to Insuring Agreements A, B, C and H, all related claims will be considered a single "claim", and only one Each Claim Limit of Liability will apply, regardless of the number of "insureds" involved or affected.  Such "claim" will be deemed to have been first made on the date the earliest of the related "claims" was first made and will be deemed to have been first reported to us on the date the earliest of the related "claims" was first reported to us.    Appeals and any post-trial proceedings will be considered part of the original "claim".  "Claims" will be deemed related if they are logically or causally connected by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions.

   **2.**    With respect to Insuring Agreements D, E, F and G, all "claims" arising out of the same, related or continuing incident(s), act(s), fact(s) or circumstance(s) will be considered a single "claim", and only one Each Claim Limit of Liability will apply, regardless of the number of "insureds" involved or affected.  All such "claims" will be deemed first made on the date the earliest of such "claims" is first made.

   **3.**    If a "claim" is covered under more than one of the Insuring Agreements of this Endorsement, then only one Each Claim Limit of Liability will apply.  We have the sole discretion to allocate "claims" paid, if any, against the appropriate Limits of Liability in this Endorsement.

**4.** In the event two or more "claims" arising out of the same facts, circumstances, situations, events or transactions are covered under more than one Insuring Agreement of this Endorsement, then only one Each Claim Limit of Liability will apply. All such "claims" will be deemed to have been first made on the date the earliest of such "claims" is first made and will be deemed to have been first reported to us on the date the earliest of such "claims" was reported to us.

**5.** If the earliest of the related "claims" was made prior to the effective date of the policy period, no coverage shall apply to the subsequent "claims" made during the policy period.

**C.** **Coverage Coordination**

If a "claim" is covered under more than one Insuring Agreement, the limit(s) of insurance set forth within the Limits of Insurance section of the Declarations of the policy and Section III of the Endorsement for each applicable Insuring Agreement (of both main policy and this Endorsement), will apply separately to the part of "loss" or damages, (including "defense costs"), covered under such Insuring Agreement, provided the company's maximum Limit of Liability for such "claim" will not exceed the largest applicable limit as set forth within the Declarations of this policy and Section III of the Endorsement for any such applicable Insuring Agreement. We have the sole discretion to allocate claims paid, if any, against the appropriate Limit of Liability.

## SECTION IV – CONDITIONS

**A.** **Notice of Claim**

As a condition precedent to exercising any right to coverage under this Endorsement:

**1.** For Insuring Agreements A, B, C or H, the "insured" must give us written notice of such "claim" during the policy period or during the Extended Reporting Period, if applicable.

**2.** For Insuring Agreements D, E, F or G, the "named insured" must give us written notice of such "claim" no later than sixty (60) days from the date an "insured" first discovers the "security breach", "privacy breach", "covered cause of loss", "adverse media report", "cyber extortion threat" or "act of terrorism" giving rise to such "claim".

**3.** An "insured" shall provide us with all information and/or documentation comprising the "claim" as well as all authorization, cooperation, or assistance as we may require.

**4.** We are not obligated to pay any "loss", "defense costs", "shadow audit expenses", "regulatory compensatory awards", "regulatory fines and penalties", "privacy breach response costs", "patient notification expenses", "patient support and credit monitoring expenses", "digital assets loss", "special expenses", "income loss", "interruption expenses", "cyber extortion expenses" and/or "cyber extortion monies" that are incurred prior to notification of a "claim".

**B.** **Notice of Potential Claim**

If, during the policy period, an "insured" first becomes aware of any facts, circumstances, situations, transactions or events which could reasonably give rise to a "claim" covered under this Endorsement, and if the "insured", during the policy period, provides us with written notice of:

**1.** the details regarding such facts, circumstances, situations, transactions or events, including the date, time and place of the alleged or potential breach;

**2.** the nature and estimate of the alleged or potential damages;

**3.** the identity of the potential claimant(s) and "insured(s)" and all other potentially involved persons and/or entities;

**4.** the manner in which an "insured" first became aware of the facts, circumstances, situations, transactions or events; and

**5.** the consequences, including, but not limited to, any potential media or regulatory consequences, which have resulted or may result therefrom,

then any "claim" subsequently arising from such reported facts, circumstances, situations, transactions or events will be deemed to be a "claim" first made on the date such notice was received by us.

**C.    Defense**

**1.** We have the right and duty to defend any "claim" under Insuring Agreements A, B and C, even if the allegations of the "claim" are groundless, false or fraudulent.  We have the right to select and retain counsel to defend an "insured".

**2.** Any "defense costs" paid under this Endorsement will reduce the limits available under this Endorsement to pay for "loss", "regulatory compensatory awards", "shadow audit expenses", "regulatory fines and penalties", "privacy breach response costs", "patient notification expenses", "patient support and credit monitoring expenses", "digital assets loss", "special expenses", "income loss", "interruption expenses", "cyber extortion expenses" and/or "cyber extortion monies".

**3.** We may investigate any "claim" as we deem appropriate.  We will not be obligated to pay, reimburse, defend, investigate or settle, or to continue to pay, reimburse, defend, investigate or settle, any "claim" under any Insuring Agreement of this Endorsement after the applicable Limit of Liability set forth in Section III – Limits of Insurance and/or the Annual Aggregate Limit of Liability has been exhausted.  We will have the right to withdraw from the further defense of any "claim" by tendering control of such defense to the "insured", and we have no other obligation or liability to pay any amounts under this Endorsement after the applicable Limit of Liability set forth in Section III – Limits of Insurance and/or the Annual Aggregate Limit of Liability has been exhausted.

**4.** We do not assume any duty to defend under Insuring Agreement H – Regulatory Defense PLUS Coverage.  Upon receiving notice of a "claim" to which Insuring Agreement H applies, we will provide you with the name(s) of panel counsel.  If you retain panel counsel to defend a "claim" under Insuring Agreement H, we will, subject to the other provisions of this Endorsement, pay 100% of covered "defense costs", "shadow audit expenses" and "regulatory fines and penalties" within the applicable Limit of Liability set forth in Section III – Limits of Insurance.  If you retain non-panel counsel, we will pay 75% of covered "defense costs", "shadow audit expenses" and "regulatory fines and penalties", up to the applicable Limit of Liability, and you must pay a co-insurance of 25%.  Rates for non-panel counsel will be limited to a maximum of $250.00 per hour.  All counsel, panel or non-panel, must comply with our Litigation Management Guidelines.  You will have the right to select the licensed attorney who provides legal services in connection with any "claim" to which Insuring Agreement H applies.

**D.    Settlement**

**1.** We have the right to settle any "claim" under Insuring Agreements A, B and C in the manner and to the extent that we believe is proper.

**2.**    You will not pay any amounts to which this Endorsement applies, or settle, offer to settle, assume any contractual obligation, admit liability, voluntarily make any payment or confess or otherwise consent to any damages or judgments without our prior written consent, which shall not be unreasonably withheld.   We will not be liable for any costs, expenses, settlement, assumed obligation, admitted liability, voluntary payment, or confessed damages or judgments to which we have not consented.

**E.**    **Loss Determination under Insuring Agreements E and G**

**1.**    <u>Loss of Digital Assets</u>: For all coverage provided under Insuring Agreement E(1), "digital assets loss" will be determined as follows:

**a.**    If the impacted "digital assets" was purchased from a third party, we will pay only the lesser of the original purchase price of the "digital assets" or the reasonable and necessary "digital assets loss".

**b.**    If it is determined that the "digital assets" cannot be replaced, restored or recreated, we will only reimburse the actual and necessary "digital assets loss" incurred up to such determination.

**2.**    <u>Income Loss</u>: For any coverage provided under Insuring Agreement E(2) and Insuring Agreement G, "income loss" will be determined as the reduction of the "named insured's" income during the "period of restoration", which is:

**a.**    The "named insured's" net income (net profit or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of a total or partial interruption, degradation in service, or failure of the "insured's computer system" caused directly by a "covered cause of loss" or an "act of terrorism".  The revenue projection will take into account the prior experience of the "named insured's" business preceding the date of the "covered cause of loss" or the "act of terrorism" and the probable experience had no "covered cause of loss" or "act of terrorism" occurred.  Revenues include the amount of money paid or payable to "named insured" for goods, products or services sold, delivered or rendered in the normal course of the "named insured's" business.   Revenue projection will be reduced by the extent to which the "named insured" uses substitute methods, facilities or personnel to maintain its revenue stream.    We will take into consideration the "named insured's" documentation of the trends in its business and variations in or other circumstances affecting its business before or after the "covered cause of loss" or "act of terrorism", which would have affected the "named insured's" business had no "covered cause of loss" or "act of terrorism" occurred; plus

**b.**    Any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the "period of restoration".

**F.**    **Regulatory Defense PLUS Coverage Special Conditions**

**1.**    <u>Voluntary Self-Disclosure</u>: In the event any "defense costs", "shadow audit expenses" or "regulatory fines and penalties" arise out of "voluntary self-disclosure", the "insured" must establish that the circumstances giving rise to the disclosure became known to the "insured" on or after the earlier of the effective date of this Endorsement or the effective date of any Endorsement issued by us to which this Policy is a continuous renewal or replacement;

**2.**    <u>Shadow Audits</u>: The "insured" shall not have a "shadow audit" performed without our prior approval of the "shadow audit" and its related expenses.  Only "shadow audit expenses" from previously approved "shadow audits" will be reimbursed under this Endorsement.  Such

approval shall not be unreasonably withheld.

**G.   Arbitration**

Notwithstanding any other provision of this Endorsement or the policy, any irreconcilable dispute between us and any "insured" is to be settled by arbitration in accordance with the then current rules of the American Arbitration Association.   Judgment upon the award may be entered in any court having jurisdiction pursuant to applicable law.   Where permissible by law, the arbitrator has the power to decide any dispute between us and any "insured" concerning the application or interpretation of this Endorsement.   However, the arbitrator shall have no power to change or add to the provisions of this Endorsement.   Prior to the beginning of arbitration, each disputing party shall pay an equal share of the estimated cost of arbitration.

**H.   Cooperation**

All "insureds" must cooperate with us and counsel defending any "insured" and assist in conducting lawsuits, appeals and other proceedings and in enforcing any right of contribution or indemnity against any person or organization who may be liable.   All "insureds" must attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.   With respect to the insurance afforded under this Endorsement, an "insured" must not, except at its own cost, voluntarily make payment, assume any obligation or incur any expense.

## SECTION V – EXTENDED REPORTING PERIOD

**A.**   If an Extended Reporting Period Endorsement is issued to the "named insured" in accordance with the policy, then the period for reporting "claims" under this Endorsement will be extended for a period of up to one (1) year immediately following termination of the policy, but only for:

    **1.**   "claims" under Insuring Agreements A, B, C, and D which:

        **a.**   arise out of a "multimedia peril", "security and privacy wrongful act", "security breach" or "privacy breach" that takes place or first commences on or after the "retroactive date" and before the end of the policy period;

        **b.**   are first made against an "insured" during the Extended Reporting Period; and

        **c.**   are reported to us during the Extended Reporting Period.

    **2.**   "claims" under Insuring Agreements E, F, and G which:

        **a.**   arise out of a "covered cause of loss", "cyber extortion threat" or "act of terrorism" that takes place or first commences during the policy period;

        **b.**   are first made during the Extended Reporting Period; and

        **c.**   are reported to us within sixty (60) days from the date an "insured" first discovers the "covered cause of loss", "cyber extortion threat" or "act of terrorism" giving rise to such "claim".

    **3.**   "claims" under Insuring Agreement H which:

        **a.**   arise out of an act, error or omission that takes place or first commences on or after the "retroactive date" and before the end of the policy period;

**b.**   are first made against an "insured" during the Extended Reporting Period; and

**c.**   are reported to us during the Extended Reporting Period.

**B.**   Cancellation or termination, for any reason, of an Extended Reporting Period automatically terminates the period for reporting "claims" under this Endorsement.   If an Extended Reporting Period is not issued for an "insured", then coverage under this Endorsement terminates when such "insured's" professional liability coverage is terminated.

**C.**   All terms, conditions, definitions and limitations of this Endorsement, including the Limits of Liability set forth in Section III – Limits of Insurance, will continue to apply during any Extended Reporting Period.

**D.**   The existence of an Extended Reporting Period will not increase or reinstate any Each Claim Limit of Liability or the Annual Aggregate Limit of Liability.

## SECTION VI – EXCLUSIONS

**A.**   We are not obligated to defend or pay any "claim" based upon, arising out of, attributable to, directly or indirectly resulting from, or in any way involving:

**1.**   any "multimedia peril", "security and privacy wrongful act", "adverse media report", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of terrorism", act, error, omission, or fact, circumstance or situation:

**a.**   that has been reported to us or to any other insurer prior to the initial inception date of this coverage;

**b.**   that was the subject of any written demand for monetary damages, administrative or arbitration proceeding or litigation commenced against any "insured" prior to the initial inception date of this coverage, or that involves the same or substantially the same facts, circumstances, situations, transactions or events underlying or alleged in the prior demand, proceeding or litigation;

**c.**   that was identified in any summary or statement of "claims" or potential "claims" submitted to us in connection with your application for insurance;

**d.**   that occurred before the earlier of the effective date of this Endorsement, or the effective date of any Endorsement issued by us to which this Policy is a continuous renewal or replacement, if on the effective date of this Endorsement, or the effective date of any Endorsement issued by us to which this Policy is a continuous renewal or replacement, any "insured" knew that such "multimedia peril", "security and privacy wrongful act", "adverse media report", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of terrorism", act, error, omission, or fact, circumstance, situation, transaction or event was likely to result in a "claim".

**2.**   the actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste.

For purposes of this exclusion, "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including mold, smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products and waste, and any electric, magnetic or electromagnetic field of any frequency.   "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed.

3.     any liability an "insured" assumes under a contract or agreement.  This exclusion does not apply if an "insured" would have been liable in the absence of the contract or agreement.  With respect to a "multimedia peril", "security breach" or "privacy breach", this exclusion does not apply to liability assumed by an "insured" in the form of a written hold harmless or indemnification agreement, provided that such "multimedia peril", "security breach" or "privacy breach" occurs, or is alleged to have occurred, after the written hold harmless or indemnification agreement is executed.

4.     any actual or alleged breach of contract, warranty, guarantee or promise.  This exclusion does not apply if an "insured" would have been liable in the absence of such contract, warranty, guarantee or promise.  This exclusion does not apply to a "claim" alleging breach of an "insured's" privacy policy.

5.     any business, joint venture or entity not named in the Declarations.

6.     any conduct, act, error or omission of any individual serving in any capacity other than as the "named insured's" principal, partner, officer, director or "employee".

7.     any "insured" gaining in fact any profit, remuneration or financial advantage to which such party was not legally entitled.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreement H.

8.     any deliberately dishonest, intentional, malicious or fraudulent act or omission or any willful violation of law by an "insured", if judgment or other final adjudication adverse to an "insured" establishes such an act, omission or willful violation.  This exclusion does not apply to any "insured" that did not commit, participate in, or have knowledge of any act, omission or violation of law described in this exclusion.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreement E resulting from "employee" sabotage.

9.     any "claim" that is covered under any other valid and collectible Insurance, or any "claim" covered under any other Insuring Agreement of the policy.

10.    any actual or alleged violation of the False Claims Act (31 U.S.C. §§ 3729 – 3733) as amended; or any similar federal or state law, rule or regulation concerning billing errors or fraudulent billing practices or abuse.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreement H.

11.    any actual or alleged infringement of any patent or trade secret.

12.    any actual or alleged unfair competition, price fixing, deceptive trade practices, restraint of trade or a violation of any securities or anti-trust laws.

13.    any obligation of an "insured" under a worker's compensation, employer's liability, disability benefits or unemployment compensation law, or any similar law, or any other employment or employment-related matter.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreement B alleging a "security and privacy wrongful act".

14.    any actual or alleged "bodily injury" or "property damage".

15.    any actual or alleged harassment or discrimination, including, but not limited to, harassment or discrimination because of, or relating to, race, creed, color, age, sex, sexual orientation or preference, national origin, religion, handicap, disability, political affiliation or marital status or any other basis prohibited by federal, state or local law.

16.    any actual or alleged satellite failures; electrical or mechanical failures and/or interruption,

including, but not limited to, electrical disturbance, electrical power interruption, spike, surge, brownout or blackout; or outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under the "named insured's" direct operational control.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreement E or Insuring Agreement G.

17.  any matter brought by or on behalf of:

    **a.**  an "insured" against another "insured"; or

    **b.**  any entity, which is owned, operated, managed, or controlled, directly or indirectly, in whole or in part by an "insured";

    **c.**  any entity which is a parent, affiliate or subsidiary of any entity in which an "insured" is a partner or joint venture; or

    **d.**  any individual who is a partner or a joint venture of any entity in which an "insured" is also a partner or joint venture.

This Exclusion does not apply to:

    **a.**  an otherwise covered "claim" under Insuring Agreement B brought by an "employee" of an "insured" alleging a "security and privacy wrongful act"; or

    **b.**  an otherwise covered "claim" under Insuring Agreement H that is brought by an "insured" as a "qui tam plaintiff".

18.  any actual or alleged violation of any of the United States of America's economic or trade sanctions or embargoes, including, but not limited to, sanctions or embargoes administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).

19.  the rendering of or the failure to render medical services.

20.  the wear and tear, drop in performance, failure to maintain, or progressive deterioration or aging of an "insured's" electronic equipment or "computer hardware".

21.  the failure of overhead transmission and distribution lines.

22.  the gradual deterioration of subterranean insulation.

23.  a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence or earthquake.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreements E or G.

24.  the gradual deterioration, wear and tear, latent or time-delayed damage of the "insured's computer system"; or an "insured's" failure, or the failure of those acting on the "named insured's" behalf, to maintain any computer, "computer system" or network, "computer software" or any other equipment.

25.  unauthorized trading.  For purposes of this exclusion, "unauthorized trading" means trading, which at the time of the trade is:

    a.  in excess of permitted financial limits, or

b.    outside of permitted product lines.

26.    the actual or alleged purchase, sale, offer, or solicitation of an offer to purchase or sell securities, the loss of value of any securities, or any actual or alleged violation of any securities law such as the provisions of the Securities Act of 1933, 15 U.S.C. § 77a et seq.; the Securities Exchange Act of 1934, 15 U.S.C. 78a et seq.; the Sarbanes-Oxley Act of 2002 (Pub. L. 107-204), as amended, or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including "Blue Sky" laws, whether such law is statutory, regulatory or common law.

27.    any actual or alleged violation of the Organized Crime Control Act of 1970 (OCCA) (Pub. L. 91-452, 84 Stat. October 15, 1970) and the "Racketeer Influenced And Corrupt Organizations Act" (RICO), 18 U.S.C. § 1961 et seq., as amended, or any regulation promulgated under the foregoing statute, or any similar federal, state, local or foreign laws, whether such law is statutory, regulatory or common law.

28.    any matter brought by the Federal Trade Commission, the Federal Communications Commission or any other federal, state or local governmental entity, in such entity's regulatory or official capacity.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreements C or H.

29.    the actual or alleged violation of any pension, healthcare, welfare, profit sharing or mutual or investment plans, funds or trusts; or the violation of any provision of the Employee Retirement Income Security Act of 1974 (ERISA) (Pub. L. 93-406, codified in part at 29 U.S.C. § 1001 et seq.), as amended, and/or the Pension Protection Act of 2006 (Pub. L. 109-280), as amended, or any regulation, ruling or order issued pursuant thereto.

30.    labor strikes or similar labor actions.

31.    war or civil war (whether declared or not), invasion, act of foreign enemy, hostilities or warlike operations , mutiny, civil commotion assuming the proportions of or amounting to a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, riot, strike, lockout, or any action taken to hinder or defend against these actions; or the confiscation, nationalization, requisition or destruction of, or damage to, property by or under the order of any governmental authority; or any action taken in controlling, preventing, suppressing or in any way relating to any of the above.  This exclusion does not apply to an "act of terrorism".

32.    gambling or pornography; prizes, awards or coupons; or the sale or provision of illegal, prohibited, restricted or regulated items such as alcoholic beverages, tobacco or drugs.

33.    any agreement by an "insured" to comply with, or follow, the Payment Card Industry Data Security Standard or any payment card company rules; or the implementation, maintenance or compliance with any security measures or standards related to any payment card data, such as any fine or penalty imposed by a payment card company on a merchant bank or payment processor that an "insured" has paid or agreed to reimburse or indemnify.  This exclusion does not apply to an otherwise covered "claim" under Insuring Agreement C.

34.    the use of programs that are not "operational programs" or "delivered programs".

35.    an "insured's" intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

36.    the confiscation, commandeering, requisition, destruction of, or damage to "computer hardware" by order of a government de jure or de facto or by any public authority for

whatever reason.

**37.** the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

**B.** With respect to Insuring Agreements A, B, C, D, and H only, we are not obligated to defend or pay any claim based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, "multimedia peril", "security and privacy wrongful act", "security breach" or "privacy breach" that takes place before the retroactive date; or any actual or alleged act, error, omission, "multimedia peril", "security and privacy wrongful act", "security breach" or "privacy breach" that takes place on or after the "retroactive date", which, together with an actual or alleged act, error, omission, "multimedia peril", "security and privacy wrongful act", "security breach" or "privacy breach" that takes place before the "retroactive date" would constitute related acts, errors, omissions, "multimedia perils", "security and privacy wrongful acts", "security breaches" or "privacy breaches".

For purposes of this exclusion, acts, errors, omissions, "multimedia perils", "security and privacy wrongful acts", "security breaches" and "privacy breaches" will be deemed related if they are logically or causally connected by any common fact, circumstance, situation, event, transaction or a series of facts, circumstances, situations, events or transactions.

**C.** With respect to Insuring Agreement H only, we are not obligated to reimburse any of the following:

**1.** "shadow audit expenses" incurred in any "shadow audit" not previously approved by us;

**2.** "restitution" or any amounts intended to serve as "restitution";

**3.** any amounts incurred by a consulting professional whose services were not previously approved by us;

**4.** any amounts incurred in any "claim" which is based upon, arising out of, related to, directly or indirectly resulting from, in consequence of, or in any way involving medical services or items which are not provided or prescribed by an "insured";

**5.** any amounts incurred in the adoption and implementation of any corporate integrity agreement, compliance program or similar provision regarding the operations of the "named insured's" business, which is negotiated as part of a settlement with, or by order of, a "government entity";

**6.** any amounts incurred in any "criminal proceeding".

**D.** With respect to Insuring Agreement E (1) only, we are not obligated to pay any of the following:

**1.** any amounts incurred in restoring, updating or replacing "digital assets" to a level beyond that which existed prior to the "covered cause of loss";

**2.** physical damage to the "computer hardware or data" center, other than damage to "electronic media" which renders stored "digital assets" no longer machine-readable;

**3.** contractual penalties or consequential damages;

**4.** any liability to third parties for whatever reason, including legal costs and expenses of any type;

    **5.**    fines or penalties imposed by law;

    **6.**    the economic or market value of "digital assets";

    **7.**    costs or expenses incurred to identify, patch or remediate software program errors or computer system vulnerabilities;

    **8.**    costs to upgrade, redesign, reconfigure or maintain the "insured's computer system" to a level of functionality beyond that which existed prior to the "covered cause of loss"; or

    **9.**    any amounts paid under Insuring Agreement E(2) – Non-Physical Business Interruption and Extra Expense.

**E.**    With respect to Insuring Agreement E(2) only, we are not obligated to pay any of the following:

    **1.**    any amounts arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence or earthquake, which results in physical damage to "computer hardware" and/or any "data" center;

    **2.**    any amounts arising out of updating or replacing "digital assets" to a level beyond that which existed prior to the "covered cause of loss";

    **3.**    contractual penalties or consequential damages;

    **4.**    any liability to third parties for whatever reason, including legal costs and expenses of any type;

    **5.**    fines or penalties imposed by law;

    **6.**    costs or expenses incurred to identify, patch or remediate software program errors or "computer system" vulnerabilities;

    **7.**    loss of goodwill and reputational harm;

    **8.**    costs to upgrade, redesign, reconfigure or maintain the "insured's computer system" to a level of functionality beyond that which existed prior to the "covered cause of loss"; or

    **9.**    any amounts paid under Insuring Agreement E(1) – Loss of Digital Assets.

**SECTION VII – OTHER INSURANCE**

The coverage provided by this Endorsement is excess insurance over any other valid and collectible insurance available to an "insured", including any self-insured retention or deductible portion thereof, whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such insurance specifically applies as excess insurance over this Endorsement.

**SECTION VIII – DEFINITIONS**

With respect to the coverage provided by this Endorsement, certain words are shown in bold print and are defined as follows.

**A.**    "Act of terrorism" means an act, including, but not limited to, the use of force or violence and/or the threat thereof, by any person or group(s) of persons, whether acting alone or on behalf of, or in connection with any organization(s) or government(s), which is committed for political, religious,

ideological, or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

**B.**   "Adverse media report" means any unpredictable report or communication of an actual or potential "security breach" or "privacy breach", which:

1.   has been publicized through any media channel including, but not limited to, television, "print media", radio or electronic networks, the Internet, and/or electronic mail; and

2.   threatens material damage to a "named insured's" reputation or brands.

**C.**   "Assumed under contract" means liability for damages resulting from a "multimedia peril" where such liability has been assumed by a "named insured" in the form of a written hold harmless or indemnification agreement, but only if the "multimedia peril" occurs, or is alleged to have occurred, after the written hold harmless or indemnification agreement is executed.

**D.**   "Billing errors proceeding" means:

1.   a written demand or civil or administrative proceeding instituted against an "insured" by a "qui tam plaintiff", "government entity" or "commercial payer" alleging the presentation of, causing or allowing to be presented, or being liable for the presentation of any actual or alleged erroneous billings by the "insured" to a government health benefit payer or "commercial payer" from which the "insured" seeks and/or has received payment or reimbursement for medical services or items provided or prescribed by the "insured"; and

2.   any proceeding described in paragraph 1 above which is instituted against an "insured" because of "voluntary self-disclosure".

**E.**   "Bodily injury" means physical injury, sickness, disease, pain or death, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress sustained by a person at any time.

**F.**   "BPO service provider" means any third-party independent contractor that provides business process outsourcing services for the "named insured's" benefit under a written contract with a "named insured", including, but not limited to, call center services, fulfillment services, and logistical support.

**G.**   "Claim(s)" means:

**1.**   with respect to Insuring Agreements A and B only:

a.   a written demand for monetary damages or non-monetary relief against an "insured";

b.   any civil or arbitration proceeding commenced against an "insured" by the service of a summons, complaint, statement of claim or similar pleading; or

c.   a written request to toll or waive a statute of limitations relating to a potential "claim" against an "insured", including any appeal therefrom.

A "claim" under Insuring Agreements A and B will be deemed to be first made when any of the foregoing is first received by an "insured".

**2.**   with respect to Insuring Agreement C only:

A "government investigation" commenced against an "insured" by letter notification, complaint or order of investigation.  A "claim" under Insuring Agreement C will be deemed to be first made when it is first received by the "insured".

**3.**  with respect to Insuring Agreement D only:

A written report by an "insured" to us of an "adverse media report", "security breach" or "privacy breach".  A "claim" under Insuring Agreement D will be deemed to be first made when such written report is received by us.

**4.**  with respect to Insuring Agreement E only:

A written report by an "insured" to us of a "covered cause of loss".  A "claim" under Insuring Agreement E will be deemed to be first made when such written report is received by us.

**5.**  with respect to Insuring Agreement F only:

A written report by an "insured" to us of a "cyber extortion threat".  A "claim" under Insuring Agreement F will be deemed to be first made when such written report is received by us.

**6.**  with respect to Insuring Agreement G only:

A written report by an "insured" to us of an "act of terrorism".  A "claim" under Insuring Agreement G will be deemed to be first made when such written report is received by us.

**7.**  with respect to Insuring Agreement H only:

A "regulatory proceeding" commenced against an "insured" by letter notification, complaint or order of investigation.  A "claim" under Insuring Agreement H will be deemed to be first made when it is first received by the "insured".

**H.**  "Commercial payer" means any private health insurance company.

**I.**  "Computer hardware" means the physical components of any computer system including CPU's, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cables, connectors, fiber optics, wires, power supply units, keyboards, display monitors and audio speakers.

**J.**  "Computer program(s)" means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner.  "Computer program(s)" include, but is not limited to, communication systems, networking systems, operating systems, and related "computer programs" used to create, maintain, process, retrieve, store, and/or transmit electronic "data".

**K.**  "Computer system(s)" means interconnected electronic, wireless, web, or similar systems (including all "computer hardware" and software) used to process and store "data" or information in an analogue, digital, electronic or wireless format including, but not limited to, "computer programs", electronic "data", operating systems, "firmware", servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic "data"), and electronic backup equipment.

**L.**  "Computer virus" means a program that possesses the ability to create replicas of itself (commonly known as an "auto-reproduction" program) within other programs or operating system areas, and which is capable of spreading copies of itself, wholly or in part, to other "computer systems".

**M.**   "Covered cause of loss" means, and is limited to, the following:

   **1.**   Accidental Damage or Destruction

      **a.**   Accidental physical damage or destruction of "electronic media", so that stored "digital assets" are no longer machine-readable;

      **b.**   Accidental damage or destruction of "computer hardware", so that stored "data" is no longer machine-readable;

      **c.**   Failure in power supply or under/over voltage, but only if such power supply is under the direct operational control of a "named insured".   "Direct operational control" includes back-up generators;

      **d.**   "Programming error" of "delivered programs"; or

      **e.**   Electrostatic build-up and static electricity.

   **2.**   Administrative or Operational Mistakes

      An accidental, unintentional, or negligent act, mistake, error or omission by an "insured", a "BPO service provider" or an outsourced "IT service provider" in:

      **a.**   the entry, or modification of the "named insured's" electronic "data", which causes damage to such "data"; or

      **b.**   the creation, handling, development, modification or maintenance of "digital assets"; or

      **c.**   the on-going operation or maintenance of the "insured's computer system", excluding the design, architecture, or configuration of the "insured's computer system".

   **3.**   Computer Crime and Computer Attacks

      An act, mistake or negligent error or omission in the operation of the "insured's computer system" or in the handling of "digital assets" by an "Insured", a "BPO service provider" or an "outsourced IT service provider", which fails to prevent or hinder any of the following on the "insured's computer system":

      **a.**   A "denial of service attack";

      **b.**   "Malicious code";

      **c.**   "Unauthorized access"; or

      **d.**   "Unauthorized use".

**N.**   "Criminal proceeding" means any governmental action for enforcement of criminal laws, including those offenses for which conviction could result in imprisonment and/or criminal fine.

**O.**   "Cyber extortion expenses" mean all reasonable and necessary costs and expenses, which the "named insured" incurs, with our prior written consent, as a direct result of a "cyber extortion threat", other than "cyber extortion monies".

**P.**   "Cyber extortion monies" mean any funds or property, which the "named insured" pays, with our

prior written consent, to a person(s) or entity (ies) reasonably believed to be responsible for a "cyber extortion threat", in order to terminate such "cyber extortion threat".

Q.   "Cyber extortion threat" means a credible threat or series of related credible threats, including, but not limited to, a demand for "cyber extortion monies", directed at an "insured" which threatens to:

1.   release, divulge, disseminate, destroy or use the confidential information of a third party taken from an "Insured" as a result of "unauthorized access" to, or "unauthorized use" of, the "insured's computer system";

2.   introduce "malicious code" into the "insured's computer system";

3.   corrupt, damage or destroy the "insured's computer system";

4.   restrict or hinder access to the "insured's computer system", including, but not limited to, the threat of a "denial of service attack"; or

5.   electronically communicate with the "named insured's" patients and falsely alleged to be the "named insured" or to act under a "named insured's" direction and falsely obtaining personal confidential information of an "insured's" patients (also known as "pharming", "phishing" or other types of false communications).

R.   "Data" means any and all information stored, recorded, appearing or present in or on the "insured's computer system", including, but not limited to, information stored, recorded, appearing or present in or on an "insured's" electronic and computer databases, the Internet, intranet, extranet and related websites, facsimiles and electronic mail.

S.   "Defense costs" means reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense and appeal of any "claim" under Insuring Agreements A, B, C or H.  "Defense costs" do not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any "insured" for time spent in cooperating in the defense and investigation of any "claim" or potential "claim" under this Endorsement.

T.   "Delivered programs" mean "computer programs", applications and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

U.   "Denial of service attack" means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a "computer system" by sending an excessive volume of electronic "data" to such "computer system" in order to prevent access to such "computer system".

V.   "Digital assets" mean "data" and "computer programs" that exist in the "insured's computer system". "Digital assets" do not include "computer hardware".

W.   "Digital assets loss" means reasonable and necessary expenses and costs which an "insured" incurs to replace, recreate or restore "digital assets" to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time.  "Digital assets loss" also includes amounts representing "employee" work time to replace, recreate or restore "digital assets", which will be determined on a predefined billable hours or per hour basis as based upon the "named insured's" schedule of "employee" billable hours.

X.   "Electronic media" means floppy disks, CD ROMs, flash drives, hard drives, solid state drives, magnetic tapes, magnetic discs, or any other media on which electronic "data" is recorded or

stored.

**Y.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**Z.** "EMTALA proceeding" means a proceeding instituted against an "insured" by a "government entity" alleging violations of the Emergency Medical Treatment and Labor Act (EMTALA) (42 U.S.C. § 13955dd), as amended.

**AA.** "Firmware" means the fixed program that internally controls basic low-level operations in a device.

**BB.** "Government entity" means:

**1.** any department, agency, task force or other organization created by any United States federal or state law, regulation, rule or executive order; or

**2.** any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the United States federal government or any state government; or

**3.** any organization operating as a Medicare Integrity Program Contractor.

**CC.** "Government investigation" means a formal investigation instituted against an "insured" by a "government entity", the subject matter of which is a "privacy breach" or "security breach".

**DD.** "HIPAA proceeding" means a proceeding instituted against an "insured" by a "government entity" alleging violation of the Health Insurance Portability and Accountability Act (HIPAA) privacy regulations(s).

**EE.** "Income loss" means financial loss sustained by the "named insured", as determined in accordance with the provisions of Insuring Agreements E(2) or G.

**FF.** "Insured" means any natural person or entity qualifying as such under Section II – Who Is An Insured of this Endorsement.

**GG.** "Insured's computer system" means:

**1.** A "computer system" operated by and either owned by, or leased to a "named insured";

**2.** With respect to Insuring Agreements B and C only, a "computer system" operated by a "BPO service provider" or an "outsourced IT service provider" and used for the sole purpose of providing hosted computer application services to a "named insured" or for processing, maintaining, hosting, or storing a "named insured's" electronic "data", pursuant to a written contract with the "named insured" to provide such services.

**HH.** "Interruption expenses" mean those expenses, excluding "special expenses", which the "named insured" incurs in accordance with the provisions of Insuring Agreements E(2) or G to:

**1.** avoid or minimize the suspension of the "named insured's" business as a result of a total or partial interruption, degradation in service, or failure of the "insured's computer system" caused directly by a "covered cause of loss" or an "act of terrorism", which the "named insured" would not have incurred had no "covered cause of loss" or "act of terrorism" occurred, including, but not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of third party services, or additional staff expenditures or labor costs; and

    **2.**    minimize or avoid a "covered cause of loss" or an "act of terrorism" and continue the "named insured's" business.

        The amount of "interruption expenses" recoverable under paragraph 1 above shall in no case exceed the amount by which the covered "income loss" is reduced by such incurred expenses.

**II.**    "Leased worker" means a person leased to the "insured" by a labor leasing firm under an agreement between the "insured" and a labor leasing firm, to perform duties related to the conduct of the "insured's" business.  "Leased worker" does not include a "temporary worker".

**JJ.**    "Loss" means the amount that an "insured" is legally obligated to pay as a result of a "claim" under Insuring Agreements A or B, including damages and judgments (including prejudgment and post-judgment interest awarded against an "insured" on that part of any judgment paid or to be paid by us); legal fees and costs awarded pursuant to such judgments; and settlements negotiated with our consent.

    "Loss" does not include: (1) taxes; (2) any amount for which an "insured" is absolved from legal responsibility to make payment to a third party; (3) an "insured's" future profits or royalties or any return, withdrawal, restitution or reduction of an "insured's" professional fees, profits or other charges; (4) punitive, liquidated or exemplary damages or the multiplied portion of multiplied damages; (5) criminal fines, sanctions or penalties; (6) any matters that are deemed uninsurable under applicable law; (7) the costs to comply with orders granting injunctive or non-monetary relief, including specific performance or any agreement to provide such relief; (8) disgorgement of any remuneration or financial advantage to which an "insured" was not legally entitled; and (9) settlements negotiated without our consent.

**KK.**    "Malicious code" means software intentionally designed to insert itself and damage a "computer system" without the owner's informed consent by a variety of forms including, but not limited to, computer viruses, worms, Trojan horses, spyware, dishonest adware, and crimeware.

**LL.**    "Multimedia peril(s)" means the release of, or display of, any "data" through any "electronic media" on a "named insured's" internet site or content through "print media" for which a "named insured" is solely responsible, which directly results in any of the following:

    **1.**    Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;

    **2.**    Invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;

    **3.**    Plagiarism, piracy or misappropriation of ideas under an implied contract;

    **4.**    Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or

    **5.**    Domain name infringement, improper deep linking or framing.

**MM.**    "Named insured" means any healthcare facility identified as such on the Declarations.

**NN.**    "Operational programs" mean programs and software that are ready for operational use, having been fully developed, tested, and accepted by a "named insured".

**OO.** "Outsourced IT service provider" means a third party independent contractor that provides information technology services for a "named insured's" benefit, under a written contract with the "named insured".  "Outsourced IT service provider" services include, but are not limited to, hosting, security management, co-location, and "data" storage.

**PP.** "Patient notification expenses" means all reasonable and necessary expenses incurred by the "named insured", with our prior written consent, to comply with governmental privacy legislation mandating notification to affected individuals in the event of a "security breach" or "privacy breach", including, but not limited to: (1) legal expenses; (2) computer forensic and investigation fees; (3) public relations expenses; (4) postage expenses; and (5) related advertising expenses.

**QQ.** "Patient support and credit monitoring expenses" means those reasonable and necessary expenses which the "named insured" incurs, with our prior written consent, for the provision of customer support activity in the event of a "privacy breach", including the provision of credit file monitoring services and identity theft education and assistance for up to a period of twelve (12) months from the date of enrollment in such credit file monitoring services.

**RR.** "Period of Restoration" means the period of time that commences on the date when the interruption, degradation or failure of the "insured's computer system" begins and ends on the earlier of:

   **1.** The date when the "insured's computer system" is restored or could have been repaired or restored with reasonable speed to the same condition, functionality and level of service that existed prior to the "covered caused of loss" or "act of terrorism", plus no more than thirty (30) consecutive days after the restoration of the "insured's computer system" to allow for restoration of the "named insured's" business; or

   **2.** One hundred and twenty (120) consecutive days after the notice of "covered cause of loss" or "act of terrorism", whichever applies, is received by "us".

**SS.** "Print media" means newspapers, newsletters, magazines, brochures, books and literary works in any form, or other types of publications and advertising materials, including packaging, photographs, and digital images.

**TT.** "Privacy breach" means any of the below, whether actual or alleged, but only if committed or allegedly committed by an "insured" or by others acting on a "named insured's" behalf for whom such "named insured" is legally responsible, including "BPO service providers" and "outsourced IT service providers":

   **1.** breach of confidence, invasion, infringement, interference, or violation of any rights to privacy including, but not limited to, breach of a "named insured's" privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion, failure to properly handle, manage, store, destroy or otherwise control a person's private information in any format, or the intrusion or misappropriation of a person's name or likeness for commercial gain; or

   **2.** any breach or violation of U.S. federal, state or local privacy statutes or regulations, as they currently exist and as amended, or as associated with confidentiality, access, control, and use of personally identifiable, non-public information, including, but not limited to:

      **a.** The Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) (HIPAA) (Pub. L. 104-191), including Title II which requires protection of confidentiality and security of electronic protected health information, and the rules and regulations promulgated thereunder as they currently exist and as amended, including related state medical privacy laws as they currently exist and as amended;

      **b.**    The Gramm-Leach-Bliley Act of 1999 (GLBA), also known as the Financial Services Modernization Act of 1999 (Pub. L. 106-102), including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder as they currently exist and as amended;

      **c.**    The State Attorneys General and the Federal Trade Commission's enforcement actions regarding security and privacy of consumer information;

      **d.**    Governmental privacy protection regulations or laws, as they currently exist and as amended, or in the future, which require commercial Internet sites or on-line services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or data theft, abuse or misuse;

      **e.**    Federal and state consumer credit reporting laws, such as the Federal Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) (FCRA), as amended; or

      **f.**    The Health Information Technology for Economic and Clinical Health Act (HITECH Act) enacted under Title XIII of the American Recovery and Reinvestment Act (ARRA) of 2009 (Pub. L. 111-5), as amended.

A series of continuing "privacy breaches", related or repeated "privacy breaches", or multiple "privacy breaches" resulting from the same facts, circumstances, situations, transactions or events will be considered a single "privacy breach" and will be deemed to have taken place at the time the first of such "privacy breaches" occurred.

**UU.**    "Privacy breach response costs" means those reasonable and necessary fees and expenses which the "named insured" incurs, with our prior written consent, for the employment of a public relations consultant, if such action is reasonably necessary to avert or mitigate any material damage to the reputation or brands of the "named insured" that reasonably will result from an "adverse media report".

**VV.**    "Programming error" means an error that occurs during the development or encoding of a "computer program", software, or application, which would, when in operation, result in a malfunction or incorrect operation of a "computer system".

**WW.**    "Property damage" means injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured.  "Data" is not considered tangible property.

**XX.**    "Qui tam plaintiff" means a private plaintiff under the False Claims Act (31 U.S.C. §§ 3729 – 3733), as amended.

**YY.**    "Regulatory compensatory award" means a sum of money which an "insured" is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a third party, due to an adverse judgment or settlement arising out of a "government investigation".  "Regulatory compensatory award" does not include a criminal penalty, fine or sanction issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

**ZZ.**    "Regulatory fines and penalties" mean any administrative fines and penalties an "insured" is legally required to pay because of a "regulatory proceeding" or "government investigation".  "Regulatory fines and penalties" do not include any criminal penalty or fine of any nature whatsoever.

**AAA.** "Regulatory proceeding" means and is limited to any of the following instituted against an "Insured":

    **1.** A "Billing errors proceeding";

    **2.** An "EMTALA proceeding";

    **3.** A "Stark proceeding"; or

    **4.** A "HIPAA proceeding".

**BBB.** "Restitution" means repayment of fees, reimbursements, profits, charges or benefit payments received by an "insured" from:

    **1.** a governmental health benefit payer or programs, carrier or intermediary making payments as part of, or in connection with, any such program; or

    **2.** a "commercial payer"; or

    **3.** any patient,

to which an "insured" was not legally entitled because of a billing error or errors, and the repayment of which is sought in a "billing errors proceeding".

**CCC.** "Retroactive date" means the date stated in Section III.A.1. – Coverage Limits, of this Endorsement, on or after which wrongful acts (as detailed under the relevant Insuring Agreement) must have taken place in order to be considered for coverage under this Endorsement.

**DDD.** "Security and privacy wrongful act" means any of the below, whether actual or alleged, but only if committed or allegedly committed by an "insured":

    **1.** The failure to prevent or hinder a "security breach", which in turn results in:

        **a.** the alteration, copying, corruption, destruction, deletion, or damage to electronic "data" stored on the "insured's computer system";

        **b.** theft, loss or unauthorized disclosure of electronic or non-electronic confidential commercial, corporate, personally identifiable, or private information that is in an "insured's" care, custody or control;

        **c.** theft, loss or unauthorized disclosure of electronic or non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a "BPO service provider" or an "outsourced IT service provider" that is holding, processing or transferring such information on the "named insured's" behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while the "named insured's" written contract with such "BPO service provider" or "outsourced IT service provider" is in effect;

        **d.** "unauthorized use" of or "unauthorized access" to a "computer system" other than the "insured's computer system";

    **2.** The failure to timely disclose a "security breach" affecting personally identifiable, non-public information, or the failure to dispose of personally identifiable, non-public information within the required time period, in violation of privacy regulations in effect now or in the future;

**3.** The failure to prevent the transmission of a "malicious code" or "computer virus" from the "insured's computer system" to the "computer system" of a third party;

**4.** A "privacy breach";

**5.** The failure to prevent or hinder participation by the "insured's computer system" in a "denial of service attack" directed against internet sites or the "computer system" of any third party; or

**6.** Loss of "employee" information; or

**7.** Infliction of emotional distress or mental anguish, but only if directly resulting from a peril described in 1 through 6 above.

**EEE.** "Security breach" means:

**1.** "unauthorized access" to, or "unauthorized use" of, the "insured's computer system", including "unauthorized access" or "unauthorized use" resulting from the theft of a password from the "insured's computer system" or from an "insured";

**2.** a "denial of service attack" against the "insured's computer system"; or

**3.** infection of the "insured's computer system" by "malicious code" or the transmission of "malicious code" from the "insured's computer system",

whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing "security breaches", related or repeated "security breaches", or multiple "security breaches" resulting from a continuing failure of computer security will be considered a single "security breach" and be deemed to have occurred at the time when the first of such "security breaches" occurred.

**FFF.** "Shadow audit" means an audit performed by a qualified professional, which examines the same billing records and related documents as those subject to an ongoing "billing errors proceeding", with the intent of providing an "insured" with a private expert opinion. Such "shadow audits" are subject to our prior approval, which shall not be unreasonably withheld.

**GGG.** "Shadow audit expense(s)" means the fees for the services of any qualified audit professional and associated expenses incurred in the course of a "shadow audit".

**HHH.** "Special expenses" mean reasonable and necessary costs and expenses that the "named insured" incurs to:

**1.** prevent, preserve, minimize, or mitigate any further damage to "digital assets", including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts;

**2.** preserve critical evidence of any criminal or malicious wrongdoing;

**3.** purchase replacement licenses for "computer program(s)": because the copy protection system and/or access control software was damaged or destroyed by a "covered cause of loss" or an "act of terrorism"; or

**4.** notify the "named insured's" patients of a total or partial interruption, degradation in service, or failure of the "insured's computer system" resulting from a "covered cause of loss" or "act

of terrorism".

**III.** "Stark proceeding" means a proceeding instituted against an "insured" by a "government entity" alleging violation of any federal, state or local anti-kickback or self-referral laws.

**JJJ.** "Temporary worker" means any natural person who is furnished to an "insured" to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**KKK.** "Unauthorized access" means the gaining of access to a "computer system" by an unauthorized person or persons.

**LLL.** "Unauthorized use" means the use of a "computer system" by unauthorized persons or authorized persons in an unauthorized manner.

**MMM.** "Voluntary self-disclosure" means an "insured" discloses information, without inquiry, to any "government entity" or "commercial payer", which may serve as grounds for a "billing errors proceeding" against the "insured". Such information must have become known to the "insured" fortuitously and subsequent to the initial effective date of this insurance.

**NNN.** "Waiting Period" means the 8-hour period of time which must elapse before we will consider the recovery of loss under Insuring Agreements E(2) or G. The "waiting period" applies to each "period of restoration".

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  9

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016



## HEALTHCARE GENERAL LIABILITY COVERAGE DECLARATIONS

This coverage declarations shows the limits of insurance and deductibles that apply to your Healthcare General Liability Coverage.

**LIMITS OF INSURANCE**

| | | |
|---|---|---|
| General Aggregate Limit: | $4,000,000 | |
| Products-Completed Operations Aggregate Limit: | $4,000,000 | |
| Personal and Advertising Injury Limit: | $2,000,000 | Any one person or organization |
| Each Occurrence Limit: | $2,000,000 | |
|    Damage To Premises Rented To You Limit: | $100,000 | Any one premises |
|    Medical Expense Limit: | $5,000 | Any one person |

**DEDUCTIBLES**

| | | |
|---|---|---|
| Bodily Injury and Property Damage Liability Deductible: | $0 | Each occurrence |
| Personal and Advertising Injury Deductible: | $0 | Any one person or organization |
| Aggregate Deductible: | $0 | |

*If no aggregate deductible is shown, you will be responsible for the deductibles described above without further limitation.*

**General Liability Retroactive Date:**  n/a

*If your General Liability Coverage is provided on a claims-made basis a retroactive date will be shown above.  If no retroactive date is shown, your coverage is provided on an occurrence basis.  The general liability coverage form will determine the basis of your coverage.*

*If this policy provides coverage on a claims-made basis to more than one insured and they maintain different retroactive dates, they will be named with their respective retroactive dates on a separate Named Insured And Retroactive Date endorsement.*

# HEALTHCARE GENERAL LIABILITY COVERAGE FORM

## PLEASE READ THE ENTIRE FORM CAREFULLY

**POLICY INDEX**

| | | |
|---|---|---|
| Insuring Agreements | Page | 1 |
| Who Is An Insured | Page | 5 |
| Limits Of Insurance | Page | 7 |
| Deductibles | Page | 8 |
| Exclusions | Page | 8 |
| Other Insurance | Page | 22 |
| Definitions | Page | 22 |

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the named insured shown in the introduction, and any other person or organization qualifying as a named insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under **Section II – Who Is An Insured**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section VII –Definitions**.

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.   **Insuring Agreement**

   a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "claim" seeking those damages. However, we will have no duty to defend the insured against any "claim" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any "claim" that may result. But:

      (1)   The amount we will pay for damages is limited as described in **Section III – Limits Of Insurance**; and

      (2)   Our right and duty to defend will end when we have used up the applicable limit of insurance in the payment of judgments or settlements under **Coverages A** or **B** or medical expenses under **Coverage C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Supplementary Payments – Coverages A and B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under **Paragraphs 1., 2.a.** or **2.b.** of **Section II – Who Is An Insured** and no "employee" authorized by you to give or receive notice of an "occurrence" or "claim", knew about or could have reasonably foreseen or discovered that any "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under **Paragraphs 1., 2.a.** or **2.b.** of **Section II – Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim", includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under **Paragraphs 1., 2.a.** or **2.b.** of **Section II – Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim":

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or "claim" for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1.** **Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "claim" seeking those damages. However, we will have no duty to defend the insured against any "claim" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle any "claim" that may result.  But:

**(1)** The amount we will pay for damages is limited as described in **Section III – Limits Of Insurance**; and

**(2)** Our right and duty to defend will end when we have used up the applicable limit of insurance in the payment of judgments or settlements under **Coverages A** or **B** or medical expenses under **Coverage C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Supplementary Payments – Coverages A and B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## COVERAGE C – MEDICAL PAYMENTS

**1.** **Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and during the policy period;

**(2)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance as described in **Section III – Limits Of Insurance**.  We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the bodily injury liability coverage applies.  We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim", including actual loss of earnings up to $500 a day because of time off from work.

**e.** All costs taxed against the insured in the "suit".

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay.  If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

Our duty to make these payments will end when we have used up the limits of insurance that apply with payment of judgments, settlements or medical expenses.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee only if we conclude that all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

    **(1)** Agrees in writing to:

        **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

        **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

        **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

        **(d)** Cooperate with us with respect to coordinating other applicable insurance

available to the indemnitee; and

**(2)**   Provides us with written authorization to:

    **(a)**   Obtain records and other information related to the "suit"; and

    **(b)**   Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as supplementary payments. Notwithstanding the provisions of **Paragraph 5.b.** of **Section V – Exclusions – Exclusions For Coverage A – Bodily Injury And Property Damage Liability**, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as supplementary payments ends when:

**(1)**   We have used up the applicable limit of insurance in the payment of judgments, or settlements; or

**(2)**   The conditions set forth above, or the terms of the agreement described in **Paragraph 2.f.** above, are no longer met.

We will have the right but not the duty to appeal a judgment awarded in a "suit" against an indemnitee if:

**(1)**   The judgment is for injury or damage for which you have assumed liability under a covered contract;

**(2)**   Such injury or damage is covered by this insurance;

**(3)**   The indemnitee and its insurers don't appeal the judgment; and

**(4)**   You agree that we may seek the cooperation of the indemnitee for such an appeal. You will not unreasonably withhold such agreement.

If we appeal such a judgment, we will pay all expenses which result directly from that appeal, including postjudgment interest and the cost of appeal bonds.  Such appeal expenses are in addition to the limits of insurance.  However, the results of an appeal will not change the limits of insurance that apply under this insurance.

**RIGHT TO APPEAL**

We will have the right, but not the duty to appeal a judgment awarded in a "suit" for injury or damage covered by this insurance if we defend the insured against the "suit" and a judgment is awarded against that insured.  If we appeal such a judgment, we will pay all expenses which result directly from that appeal, including postjudgment interest and the cost of appeal bonds.  Such appeal expenses are in addition to the limits of insurance.  However, the results of an appeal will not change the limits of insurance that apply under this insurance.

**SECTION II – WHO IS AN INSURED**

1.     If you are designated in the introduction as:

    **a.**     An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **b.**     A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    **c.**     A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **d.**     A corporation or organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

    **e.**     A trust, you are an insured.  Your trustees are also insureds, but only with respect to their duties as trustees.

2.     Each of the following is also an insured:

    **a.**     Your "administrators" are insureds only for their duties as your "administrators".

    **b.**     Persons performing services on or for your formal review boards or committees are insureds, but only while performing covered services required or requested by such boards or committees.

    **c.**     Your "volunteer workers" and students only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees", students or "volunteer workers" are insureds for:

        **(1)**     "Bodily injury" or "personal and advertising injury":

            **(a)**     To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other students or "volunteer workers" while performing duties related to the conduct of your business;

            **(b)**     To the spouse, child, parent, brother or sister of that co-"employee", student or "volunteer worker" as a consequence of **Paragraph (1)(a)** above;

            **(c)**     For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in **Paragraphs (1)(a)** or **(b)** above;

            **(d)**     Arising out of his or her providing or failing to provide "health care professional services"; or

        **(2)**     "Property damage" to property:

    **(a)**    Owned, occupied or used by,

    **(b)**    Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", students or "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**d.**    Any person (other than your "employee", student or "volunteer worker"), or any organization while acting as your real estate manager.

**e.**    Any person or organization having proper authorized temporary custody of your property if you die, but only:

    **(1)**    With respect to liability arising out of the maintenance or use of that property; and

    **(2)**    Until your legal representative has been appointed.

**f.**    Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this coverage form.

**g.**    Any "landlord" of a premises rented or leased to you is an insured only for the ownership, maintenance, or use of the premises while you rent or lease it.  However, no "landlord" is a protected person for injury or damage that results from any of the following work while being done by or for the "landlord":

    **(1)**    Structural changes.

    **(2)**    New construction work.

    **(3)**    Demolition work.

**h.**    Any "lessor" of equipment rented or leased to you is a protected person only for your operation, maintenance, or use of the equipment while you rent or lease it.  However, no equipment "lessor" is a protected person for injury or damage that results from their sole negligence.

**3.**    With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

    **a.**    "Bodily injury" to a co-"employee", fellow student or fellow "volunteer worker" of the person driving the equipment; or

    **b.**    "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.**    Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as an insured if there is no other similar insurance available to that organization. However:

  **a.**  Coverage under this provision is afforded only until the ninetieth (90th) day after you acquire or form the organization or the end of the policy period, whichever is earlier;

  **b.**  **Coverage A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

  **c.**  **Coverage B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a named insured in the introduction.

## SECTION III – LIMITS OF INSURANCE

**1.**  The limits of insurance shown in the declarations and the rules below fix the most we will pay regardless of the number of:

  **a.**  Insureds;

  **b.**  "Claims" made; or

  **c.**  Persons or organizations making "claims" .

**2.**  The general aggregate limit is the most we will pay for the sum of:

  **a.**  All medical expenses under **Coverage C**;

  **b.**  All damages under **Coverage A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

  **c.**  All damages under **Coverage B**.

**3.**  The products-completed operations aggregate limit is the most we will pay under **Coverage A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.**  Subject to **Paragraph 2.** above, the personal and advertising injury limit is the most we will pay under **Coverage B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.**  Subject to **Paragraph 2.** or **Paragraph 3.** above, whichever applies, the each occurrence limit is the most we will pay for the sum of:

  **a.**  Damages under **Coverage A**; and

  **b.**  Medical expenses under **Coverage C**

because of all covered "bodily injury" and "property damage" arising out of any one "occurrence".

**6.**  Subject to **Paragraph 5.** above, the damage to premises rented to you limit is the most we will pay under **Coverage A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to **Paragraph 5.** above, the medical expense limit is the most we will pay under **Coverage C** for all medical expenses because of "bodily injury" sustained by any one person.

The limits of insurance apply to the policy period set forth in the introduction or any endorsement thereto.

If the amount of the general aggregate limit or the products-completed operations aggregate limit is left blank in the declarations, we will consider that the aggregate limit is equal to the each occurrence limit or $200,000, whichever amount is more.

## SECTION IV – DEDUCTIBLES

1. Our obligation under this insurance to pay damages for covered "bodily injury", "property damage", or "personal and advertising injury" on your behalf applies only to the amount of damages in excess of the deductible amount stated in the declarations.  The deductible shown in the declarations and the rules below fix the amount of damages over which the limits of insurance will apply regardless of the number of:

   a. Insureds;

   b. "Claims" reported; or

   c. Persons or organizations making "claims".

   The bodily injury liability deductible is the amount that will be your responsibility for all damages because of "bodily injury" arising out of any one "occurrence".

   The property damage liability deductible is the amount that will be your responsibility for all damages because of "property damage" arising out of any one "occurrence".

   The personal and advertising injury limit deductible is the amount that will be your responsibility for all damages because of "personal and advertising injury" to any one person or organization.

   The aggregate deductible is the most you will be responsible for paying for the combined total of all deductibles applying in a policy period.  If no aggregate deductible is shown in the declarations, you will be responsible for the deductibles described above without further limitation.

   The deductible does not apply to any **Supplementary Payments – Coverages A And B** or to **Coverage C – Medical Payments.**

2. The terms of this insurance, including those with respect to:

   a. Our right and duty to defend you against any "suit"; and

   b. Your duties in the event of a "claim"

   apply irrespective of the application of the deductible amount.

3. We may pay any part or all of the deductible amount to effect settlement of a "claim" and, upon notification of the action taken, you shall reimburse us within thirty (30) days of the notification for such part of the deductible amount as has been paid by us.

## SECTION V – EXCLUSIONS

## EXCLUSIONS FOR COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

This insurance does not apply to any "claim" that alleges:

1.    **Abuse Or Molestation**

Injury or damage that is in any way related to, in whole or in part, "abuse or molestation". We will, however, defend such "claim" provided that no insured, other than the alleged perpetrator and/or victim, knew about or could have reasonably foreseen or discovered the event which gave rise to such "claim". Our duty to pay expenses will end when we have paid an amount equal to the each occurrence limit of insurance shown in the declarations.

2.    **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the "claims" against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

    **a.**    This exclusion does not apply to:

        **(1)**    A watercraft while ashore on premises you own or rent;

        **(2)**    A watercraft you do not own that is:

            **(a)**    Less than fifty (50) feet long; and

            **(b)**    Not being used to carry persons or property for a charge;

        **(3)**    Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

        **(4)**    Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

        **(5)**    "Bodily injury" or "property damage" arising out of:

            **(a)**    The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

            **(b)**    The operation of any of the machinery or equipment listed in **Section VII – Definitions**, **Paragraph e.(1)** or **e.(2)** of the definition of "mobile equipment".

3.    **Violation Of An Antitrust Law**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from any violation of an antitrust law.

4.    **Asbestos**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from the "asbestos hazard".

This exclusion includes but is not limited to compliance with any request, demand, order, or statutory or regulatory requirement, or any other action authorized or required by law, or any other "claim", demand, loss, cost or expense arising out of, relating to or resulting from the investigation of, abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "asbestos", as well as any costs, fees, expenses, penalties, judgments, fines or sanctions arising or resulting therefrom or relating thereto.

As used in this exclusion, "asbestos hazard" means:

**a.** The actual, alleged or threatened exposure to, consumption of, ingestion of, inhalation of, absorption of, existence of, or presence of, "asbestos" in any manner or form whatsoever, either directly or indirectly;

**b.** The actual or alleged failure to warn, advise or instruct related to "asbestos" in any manner or form whatsoever;

**c.** The actual or alleged failure to prevent exposure to "asbestos" in any manner or form whatsoever;

**d.** The actual or alleged presence of "asbestos" in any manner or form whatsoever, in any place whatsoever, whether or not within a building or structure, including its contents.

As used in this exclusion, "asbestos" means any substance, regardless of its form or state, containing asbestos.

5. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**a.** That the insured would have in the absence of the contract or agreement; or

**b.** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(1)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(2)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

6. **Criminal Acts**

"Bodily injury" or "property damage" arising out of a criminal act, including but not limited to "abuse or molestation" or fraud, committed by or at the direction of the insured.

**7.    Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**a.**    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**b.**    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**8.    Damage To Property**

"Property damage" to:

**a.**    Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.**    Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**c.**    Property loaned to you;

**d.**    Personal property in the care, custody or control of the insured;

**e.**    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**f.**    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **a.**, **c.** and **d.** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven (7) or fewer consecutive days. A separate limit of insurance applies to damage to premises rented to you as described in **Section III – Limits Of Insurance**.

Paragraph **b.** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **c.**, **d.**, **e.** and **f.** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **f.** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**9.    Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

10.  **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

11.  **Directors And Officers**

Any "wrongful act" of any of your directors or officers in the discharge or performance of their duties as such.

**a.**   Any "claim" for damages against any corporation brought by any director or officer for indemnification or to be reimbursed for; or

**b.**   Any damages to which any director or officer is or was a party to which is based on a "wrongful act".

For the purposes of this exclusion, "wrongful act" means any actual or alleged error, misstatement, misleading statement, act or omission, neglect, or breach of duty while acting in the capacity of a director or officer.

This exclusion does not apply to "bodily injury" or "property damage".

12.  **Dishonest, Fraudulent, Malicious, Uninsurable Acts**

"Bodily injury" or "property damage" arising out of any dishonest, fraudulent or malicious act, including reckless violation of any statute, or any act deemed uninsurable by law, committed by any insured.

13.  **Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.**   The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.**   The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.**   Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

14.  **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

15. **Employer's Liability**

   "Bodily injury" to:

   a.   An "employee" of the insured arising out of and in the course of:

       (1)   Employment by the insured; or

       (2)   Performing duties related to the conduct of the insured's business; or

   b.   The spouse, child, parent, brother or sister of that "employee" as a consequence of **Paragraph a.** above.

   This exclusion applies:

   a.   Whether the insured may be liable as an employer or in any other capacity; and

   b.   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

   This exclusion does not apply to liability assumed by the insured under an "insured contract".

16. **E.R.I.S.A.**

   Any obligation of the insured under the Employees' Retirement Income Security Act of 1974 (E.R.I.S.A.), or any amendment or addition to this act or similar provisions of any federal, state or local law.

17. **Employment-Related Practices**

   "Bodily injury" to:

   a.   A person arising out of any:

       (1)   Refusal of employment;

       (2)   Termination of employment; or

       (3)   Employment-related practices, policies, acts or omissions, including coercion, demotion, evaluation, reassignment, discipline, false imprisonment, invasion of rights of privacy, infliction of emotional distress, defamation, harassment, humiliation or discrimination directed at that person; or

   b.   The spouse, child, parent, brother or sister of that person as a consequence of such injury or damage.

   This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

18. **Expected Or Intended Injury**

   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect

persons or property.

**19.    Fungi And Bacteria Exclusion**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from the "fungi or bacteria hazard".

This exclusion includes, but is not limited to, compliance with any request, demand, order, or statutory or regulatory requirement, or any other action authorized or required by law, or any other "claim", demand, loss, cost, or expense arising out of, relating to or resulting from the investigation of, abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi or bacteria", as well as any loss, costs, fees, expenses, penalties, judgments, fines, or sanctions arising out of, relating thereto or resulting therefrom.

This exclusion does not apply to any "fungi or bacteria" that are on or are contained in food or beverages. However, this exception does not apply to the presence of "fungi or bacteria" in any other place whether directly or indirectly resulting from such food or beverages.

As used in this exclusion, "fungi or bacteria hazard" means:

**a.**    Actual, alleged or threatened exposure to, consumption of, ingestion of, inhalation of, absorption of, existence of or presence of, "fungi or bacteria" in any manner or form whatsoever;

**b.**    The actual or alleged failure to warn, advise or instruct related to "fungi or bacteria" in any manner or form whatsoever;

**c.**    The actual or alleged failure to prevent exposure to "fungi or bacteria" in any manner or form whatsoever; or

**d.**    The actual or alleged presence of "fungi or bacteria" in any manner or form whatsoever, in any place whatsoever, whether or not within a facility owned or used by the named insured, including its contents.

As used in this exclusion, "fungi or bacteria" include, without limitation, mold, mildew, yeast, spores, mycotoxins, endotoxins, or other pathogens, as well as any particulates or byproducts of any of the foregoing, either directly or indirectly.

**20.    Healthcare Professional Services**

"Bodily injury" or "property damage" that result from the performance of or failure to perform "health care professional services".

**21.    Intellectual Property**

"Bodily injury" or "property damage" that results from any actual or alleged infringement or violation of any rights or laws to copyright, patent, trade dress, trade name, trade secret, trademark, or other intellectual property rights or laws.

**22.    Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    **a.**     Causing or contributing to the intoxication of any person;

    **b.**     The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    **c.**     Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**23.**   **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

    **a.**     The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

    **b.**     The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**24.**   **Non-Monetary Damages**

Injury or damage for non-monetary damages.

**25.**   **Nuclear Energy Liability**

    **a.**     "Bodily injury" or "property damage" for which any insured is also protected under a nuclear energy liability insurance policy or would have been protected under such a policy if that policy's limits of insurance had not been used up.

    **b.**     "Bodily injury" or "property damage" that results from the "hazardous property" of "nuclear material" and for which:

        **(1)**   Any insured is required by law to maintain financial protection in accordance with the federal Atomic Energy Act, or any of its amendments; or

        **(2)**   Any insured is entitled, or would have been entitled had this insurance not been issued, to indemnity from the United States government, or any of its agencies, under any contract or agreement between the government, or any of its agencies, and any insured.

    **c.**     "Bodily injury" or "property damage" that results from the "hazardous properties" of "nuclear material" when:

        **(1)**   The "nuclear material" is located at, or at any time discharges or disperses from, a "nuclear facility" which is or was at any time owned by any insured, or operated by or for any insured;

        **(2)**   The "nuclear material" is contained in "spent nuclear fuel" or "nuclear waste" that is or was at any time possessed, handled, used, processed, stored, transported, or disposed of by or for any insured; or

        **(3)**   The "bodily injury" or "property damage" results from the furnishing by any insured of

services, materials, parts or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility".

**26.  Other Coverage Forms**

Injury or damage which is covered under any other coverage form attached to this policy, unless otherwise stated.

**27.  Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**28.  Pollution**

**a.** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(a)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(b)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(c)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(2)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(3)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(4)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(a)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does

not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(b)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(c)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(5)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** "Claim" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such "claim" by or on behalf of a governmental authority.

**29. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**a.** "Your product";

**b.** "Your work"; or

**c.** "Impaired property"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**30. Terrorism**

Injury or damage that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with an "act of terrorism", including action in hindering, controlling,

preventing, suppressing, retaliating against, responding to or defending against an actual or expected "act of terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

This exclusion also applies to an "act of terrorism" that:

**a.**   Is carried out by means of dispersal or application of radioactive material or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination;

**b.**   Involves radioactive material that is released and it appears that one purpose of the "act of terrorism" was to release such material;

**c.**   Involves the use, release, or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination;

**d.**   Is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**e.**   In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

In the event an "act of terrorism" involves nuclear reaction or radiation, or radioactive contamination, this exclusion supersedes any Nuclear Energy Liability Exclusion.

**31.**   **War**

Injury or damage that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with:

**a.**   War, including undeclared or civil war; or

**b.**   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.**   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**32.**   **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**Exclusions 2., 7., 8., 9., 10., 12., 19., 20., 24., 25., 26.** and **27.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in **Section III – Limits Of Insurance**.

**EXCLUSIONS FOR COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

This insurance does not apply to any "claim" that alleges:

1.    **Abuse Or Molestation**

Injury or damage that is in any way related to, in whole or in part, "abuse or molestation". We will, however, defend such "claim" provided that no insured, other than the alleged perpetrator and/or victim, knew about or could have reasonably foreseen or discovered the event which gave rise to such "claim". Our duty to pay expenses will end when we have paid an amount equal to the each occurrence limit of insurance shown in the declarations.

2.    **Violation Of An Antitrust Law**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from any violation of an antitrust law.

3.    **Asbestos**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from the "asbestos hazard".

This exclusion includes but is not limited to compliance with any request, demand, order, or statutory or regulatory requirement, or any other action authorized or required by law, or any other "claim", demand, loss, cost or expense arising out of, relating to or resulting from the investigation of, abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "asbestos", as well as any costs, fees, expenses, penalties, judgments, fines or sanctions arising or resulting therefrom or relating thereto.

As used in this exclusion, "asbestos hazard" means:

a.    The actual, alleged or threatened exposure to, consumption of, ingestion of, inhalation of, absorption of, existence of, or presence of, "asbestos" in any manner or form whatsoever, either directly or indirectly;

b.    The actual or alleged failure to warn, advise or instruct related to "asbestos" in any manner or form whatsoever;

c.    The actual or alleged failure to prevent exposure to "asbestos" in any manner or form whatsoever;

d.    The actual or alleged presence of "asbestos" in any manner or form whatsoever, in any place whatsoever, whether or not within a building or structure, including its contents.

As used in this exclusion, "asbestos" means any substance, regardless of its form or state, containing asbestos.

4.    **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

5.    **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

6.      **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

7.      **Directors And Officers**

Any "wrongful act" of any of your directors or officers in the discharge or performance of their duties as such.

    **a.**    Any "claim" for damages against any corporation brought by any director or officer for indemnification or to be reimbursed for; or

    **b.**    Any damages to which any director or officer is or was a party to which is based on a "wrongful act".

For the purposes of this exclusion, "wrongful act" means any actual or alleged error, misstatement, misleading statement, act or omission, neglect, or breach of duty while acting in the capacity of a director or officer.

This exclusion does not apply to "personal and advertising injury".

8.      **Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

    **a.**    The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

    **b.**    The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

    **c.**    Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

9.      **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

10.     **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

11.     **Fungi And Bacteria Exclusion**

Injury or damage that in any way, in whole or in part, arises out of, relates to or results from the

"fungi or bacteria hazard".

This exclusion includes, but is not limited to, compliance with any request, demand, order, or statutory or regulatory requirement, or any other action authorized or required by law, or any other "claim", demand, loss, cost, or expense arising out of, relating to or resulting from the investigation of, abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi or bacteria", as well as any loss, costs, fees, expenses, penalties, judgments, fines, or sanctions arising out of, relating thereto or resulting therefrom.

This exclusion does not apply to any "fungi or bacteria" that are on or are contained in food or beverages. However, this exception does not apply to the presence of "fungi or bacteria" in any other place whether directly or indirectly resulting from such food or beverages.

As used in this exclusion, "fungi or bacteria hazard" means:

a.   Actual, alleged or threatened exposure to, consumption of, ingestion of, inhalation of, absorption of, existence of or presence of, "fungi or bacteria" in any manner or form whatsoever;

b.   The actual or alleged failure to warn, advise or instruct related to "fungi or bacteria" in any manner or form whatsoever;

c.   The actual or alleged failure to prevent exposure to "fungi or bacteria" in any manner or form whatsoever; or

d.   The actual or alleged presence of "fungi or bacteria" in any manner or form whatsoever, in any place whatsoever, whether or not within a facility owned or used by the named insured, including its contents.

As used in this exclusion, "fungi or bacteria" include, without limitation, mold, mildew, yeast, spores, mycotoxins, endotoxins, or other pathogens, as well as any particulates or byproducts of any of the foregoing, either directly or indirectly.

**12.   Employment-Related Practices**

"Personal and advertising injury" to:

a.   A person arising out of any:

    (1)   Refusal to employ that person;

    (2)   Termination of that person's employment; or

    (3)   Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

b.   The spouse, child, parent, brother or sister of that person as a consequence of such injury or damage.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

13.   **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the actual or alleged infringement of copyright, patent, trade dress, trade name, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

14.   **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**a.**   Advertising, broadcasting, publishing or telecasting;

**b.**   Designing or determining content of web-sites for others; or

**c.**   An Internet search, access, content or service provider.

However, this exclusion does not apply to **Paragraphs a., b.** and **c**. of "personal and advertising injury" under **Section VII - Definitions**.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

15.   **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

16.   **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of the oral or written publication, television or radio or other electronic publication of any kind whatsoever (including, but not limited to publication by means of Internet, extra-net, e-mail or website), of material whose first  publication took place before the beginning of the policy period.

17.   **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, television or radio or other electronic publication of any kind whatsoever (including, but not limited to publication by means of Internet, extra-net, e-mail or website), of material, if done by or at the direction of the insured with knowledge of its falsity.

18.   **Other Coverage Forms**

Injury or damage which is covered under any other coverage form attached to this policy, unless otherwise stated.

19.   **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**20.  Pollution-Related**

Any loss, cost or expense arising out of any:

**a.**  Request, demand or order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**b.**  "Claim" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**21.  Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**22.  Terrorism**

Injury or damage that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with an "act of terrorism", including action in hindering, controlling, preventing, suppressing, retaliating against, responding to or defending against an actual or expected "act of terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

This exclusion also applies to an "act of terrorism" that:

**a.**  Is carried out by means of dispersal or application of radioactive material or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination;

**b.**  Involves radioactive material that is released and it appears that one purpose of the "act of terrorism" was to release such material;

**c.**  Involves the use, release, or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination;

**d.**  Is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**e.**  In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

In the event an "act of terrorism" involves nuclear reaction or radiation, or radioactive contamination, this exclusion supersedes any Nuclear Energy Liability Exclusion.

**23.  Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**24.  War**

Injury or damage that results directly or indirectly from, contributed to by, resulting from or arising out of or in connection with:

**a.**    War, including undeclared or civil war; or

**b.**    Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.**    Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**25.    Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

## EXCLUSIONS FOR COVERAGE C – MEDICAL PAYMENTS

We will not pay expenses for "bodily injury":

**1.**    To any insured, except "volunteer workers".

**2.**    To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**3.**    To a person injured on that part of premises you own or rent that the person normally occupies.

**4.**    To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**5.**    To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**6.**    Included within the "products-completed operations hazard".

**7.**    Excluded under **Coverage A**.

**8.**    To a person injured while receiving "health care professional services" on any premises you own, rent, lease or borrow.

## SECTION VI – OTHER INSURANCE

This insurance is excess of any other valid and collectible insurance available to you whether that insurance is stated to be primary, pro-rata, contributory, excess, contingent or otherwise, unless that insurance specifically applies as excess insurance over this coverage form.

## SECTION VII – DEFINITIONS

**1.**    "Abuse or molestation" includes but is not limited to any physical, mental, or moral harassment, assault or intimacy of a sexual nature even if consensual.

2.  "Act of terrorism" means activities against persons, organizations or property of any nature:

    a.  That involve the following or preparation for the following:

        (1)  Use or threat of force or violence;

        (2)  Commission or threat of a dangerous act; or

        (3)  Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

    b.  When one or both of the following applies:

        (1)  The effect is to intimidate or coerce a government, de jure or de facto of any nation or any political division thereof, or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

        (2)  It appears that the intent is to intimidate or coerce a government, de jure or de facto of any nation or any political division thereof, or to further political, ideological, religious, social, economic or similar objectives or to express (or express opposition to) a philosophy or ideology

    regardless of the amount of damage or loss.

3.  "Administrators" means any "administrator", superintendent or chief executive officer, chief operating officer, chief financial officer, medical director, department head or staff member that performs administrative duties for you.

4.  "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters or increasing sales or business.  For the purposes of this definition:

    a.  Notices that are published include material placed on the Internet or on similar electronic means of communication; and

    b.  Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement".

5.  "Auto" means:

    a.  A land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment; or

    b.  Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

    However, "auto" does not include "mobile equipment".

6.  "Bodily injury" means physical harm, including sickness, disease or death, to the physical health of other persons.  It includes mental anguish, injury or illness, or emotional distress, that results from such physical harm, sickness or disease.

7.  "Claim" means a demand which seeks damages, any circumstance which is likely to result in a

demand for damages, or "suit".

However, we will not consider a patient incident report, variance report, or any other report, made for loss prevention purposes, to be a "claim", even if you send it to us or one of our agents.

8.   "Coverage territory" means:

   **a.**   The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.**   International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **Paragraph a.** above; or

   **c.**   All other parts of the world if the injury or damage arises out of:

      **(1)**   Goods or products made or sold by you in the territory described in **Paragraph a.** above;

      **(2)**   The activities of a person whose home is in the territory described in **Paragraph a.** above, but is away for a short time on your business; or

      **(3)**   "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" in the territory described in **Paragraph a**. above or in a settlement we agree to.

   However, the "coverage territory" does not include any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

9.   "Employee" includes a "leased worker".  "Employee" does not include a "temporary worker".

10.   "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

11.   "Hazardous properties" include radioactive, toxic or explosive properties.

12.   "Health care professional services" means:

   **a.**   Medical, surgical, dental, x-ray, nursing, mental, or other similar "health care professional services" or treatments.

   **b.**   Providing or dispensing of food, beverages, medications or medical supplies or appliances in connection with services described in **Paragraph a.** above.

   **c.**   Handling or treatment of dead bodies, including autopsies, organ donation or harvesting, or other procedures.

   **d.**   The work of your formal accreditation, standards review or equivalent professional board or committee, done for any insured while:

      **(1)**   Evaluating the professional qualifications or clinical performance of any provider of "health care professional services"; or

**(2)** Promoting and maintaining the quality of "health care professional services" being provided.

**e.** The execution, or failure to execute, a decision or directive of your formal accreditation, standards review or equivalent professional board or committee.

**13.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**14.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**15.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other written contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**Paragraph f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)**    Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)**    Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

  **(3)**    Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **Paragraph (2)** above and supervisory, inspection, architectural or engineering activities.

**16.**    "Landlord" means the owner, "lessor", or manager of a premises.

**17.**    "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**18.**    "Lessor" means the owner or someone who rents or leases property to others.

**19.**    "Loading or unloading" means the handling of property:

  **a.**    After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

  **b.**    While it is in or on an aircraft, watercraft or "auto"; or

  **c.**    While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**20.**    "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

  **a.**    Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

  **b.**    Vehicles maintained for use solely on or next to premises you own or rent;

  **c.**    Vehicles that travel on crawler treads;

  **d.**    Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    **(1)**    Power cranes, shovels, loaders, diggers or drills; or

    **(2)**    Road construction or resurfacing equipment such as graders, scrapers or rollers;

  **e.**    Vehicles not described in **Paragraphs a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **Paragraphs a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**21.** "Nuclear facility" means any "nuclear reactor", "uranium isotopes separation device or equipment", "special nuclear material device or equipment", or "nuclear waste site". "Nuclear facility" includes the site on which it is located, all operations conducted on such site, and all premises used for such operations.

**22.** "Nuclear reactor" means any device, equipment, or machine designed or used to:

**a.** Sustain nuclear fission in a self-supporting chain reaction; or

**b.** Contain a critical mass of fissionable material.

**23.** "Nuclear material" means any of the following materials which are defined in the federal Atomic Energy Act, or any of its amendments:

**a.** Source material;

**b.** Special nuclear material; or

**c.** By-product material.

**24.** "Nuclear waste site" means any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "nuclear waste".

**25.** "Nuclear waste" means any waste material that contains by-product material and results from the

operation of any "nuclear reactor", or "uranium isotopes separation device or equipment", by any insured. "Nuclear waste" does not include tailings or wastes that result from the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.

26. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

27. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, "landlord" or "lessor";

    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

    **f.** The use of another's advertising idea in your "advertisement"; or

    **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

All "personal and advertising injury" arising out of the same or similar material, regardless of the mode in which such material is communicated, including but not limited to publication by means of Internet, extra-net, email or website, will be considered as arising solely out of one offense.

28. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

29. "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)** Products that are still in your physical possession; or

        **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)** When all of the work called for in your contract has been completed.

            **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the declarations or in a policy schedule, states that products-completed operations are subject to the general aggregate limit.

**30.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property of others that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**31.** "Special nuclear material device or equipment" means any device or equipment used for the processing, fabricating, or alloying of special nuclear material if the total amount of such material is at any time in the custody of any insured at the premises where the device or equipment is located and is more than 25 grams of plutonium or uranium 233, or any combination of those two materials; or is more than 250 grams of uranium 235.

**32.** "Spent nuclear fuel" means any solid or liquid fuel element or component that has been exposed to radiation or used in a "nuclear reactor".

**33.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; and

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**34.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**35.** "Uranium isotopes separation device or equipment" means any device or equipment designed or used for separating the isotopes of uranium or plutonium; processing or utilizing "spent nuclear fuel"; or handling, processing or packaging "nuclear waste".

**36.**   "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**37.**   "Your product" means:

    **a.**   Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        **(1)**   You;

        **(2)**   Others trading under your name; or

        **(3)**   A person or organization whose business or assets you have acquired; and

    **b.**   Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

    **a.**   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **b.**   The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**38.**   "Your work" means:

    **a.**   Work or operations performed by you or on your behalf; and

    **b.**   Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

    **a.**   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **b.**   The providing of or failure to provide warnings or instructions.

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**EMPLOYEE BENEFITS LIABILITY COVERAGE ENDORSEMENT**

THIS ENDORSEMENT PROVIDES CLAIMS-MADE AND REPORTED COVERAGE.   CLAIMS MUST FIRST BE MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD UNLESS AN EXTENDED REPORTING PERIOD APPLIES. PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.

This endorsement modifies insurance provided under the following:

Healthcare General Liability Coverage Form.

**SCHEDULE**

| Coverage | | | | |
|---|---|---|---|---|
| Employee Benefits Programs: | | | | |
| **Limit Of Insurance** | | **Deductible** | | **Premium** |
| $1,000,000 | Each Employee | $1,000 | Each Employee | $300.00 |
| $3,000,000 | Aggregate | | | |
| Retroactive Date: 11/01/2006 | | | | |

**A.**    The following is added to **Section I – Coverages**:

**COVERAGE – EMPLOYEE BENEFITS LIABILITY**

    **1.**      **Insuring Agreement**

        **a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking damages to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.  We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result.  But:

            **(1)**     The amount we will pay for damages is limited as described in **Paragraph E.** (**Section III – Limits of Insurance**); and

            **(2)**     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Supplementary Payments**.

        **b.**      This insurance applies to damages only if:

**(1)** The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

**(2)** The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

**(3)** A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with **Paragraph c.** below, and reported to us in writing during the policy period or an Extended Reporting Period we provide under **Paragraph G**. of this endorsement.

**c.** A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

**(2)** When we make settlement in accordance with **Paragraph 1.a** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received on the last day of the policy period, if no subsequent policy is available to cover the claim.

**d.** All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be considered one "claim" and deemed to have been made at the time the first of those "claims" is made against any insured.

**2. Exclusions**

This insurance does not apply to:

**a. Dishonest, Fraudulent, Criminal or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, or Personal and Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**d. Insufficiency of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advise Given With Respect To Participation**

Any "claim" based upon:

**(1)**   Failure of any investment to perform;

**(2)**   Errors in providing information on past performance of investment vehicles; or

**(3)**   Advise given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f.   Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g.   E.R.I.S.A.**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h.   Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i.   Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j.   Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.**   For the purposes of the coverage provided by this endorsement:

**1.**   All references to **Supplementary Payments – Coverages A** and **B** are replaced by **Supplementary Payments – Coverages A, B** and **Employee Benefits Liability**.

**2.**   Paragraphs **1.b** and **2**. of the **Supplementary Payments** provision do not apply.

**C.**   For the purposes of the coverage provided by this endorsement, **Paragraphs 2.** and **4**. of **Section II – Who Is An Insured** are replaced by the following:

**2.**   Each of the following is also an insured:

**a.**   Each of your "employees" who is or was authorized to administer your "employees benefit program".

**b.**   Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal

representative is appointed.

    **c.**    Your legal representative if you die, but only with respect to duties as such.   That representative will have all your rights and duties under this endorsement.

**4.**    Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization.  However;

    **a.**    Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

    **b.**    Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.**    For the purposes of the coverage provided by this endorsement, **Paragraph 3.** of **Section II – Who Is An Insured** does not apply.

**E.**    For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

    **1.**    **Limits of Insurance**

    **a.**    The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

    **(1)**    Insureds;

    **(2)**    "Claims" made or "suits" brought;

    **(3)**    Persons or organizations making "claims" or bringing "suits";

    **(4)**    Acts, errors or omissions; or

    **(5)**    Benefits included in your "employee benefit program".

    **b.**    The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

    **c.**    Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

    **(1)**    An act, error or omission; or

    **(2)**    A series of related acts, errors or omissions

negligently committed in the "administration" of your "employee benefit program".

However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Introduction of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**2.    Deductible**

**a.**    Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee.  The limits of insurance shall not be reduced by the amount of this deductible.

**b.**    The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

**c.**    The terms of this insurance, including those with respect to:

**(1)**    Our right and duty to defend any "suits" seeking those damages; and

**(2)**    Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

apply irrespective of the application of the deductible amount.

**d.**    We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**F.**    For the purposes of the coverage provided by this endorsement, the following is added:

**1.    Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

**a.**    You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim".  To the extent possible, notice should include:

**(1)**    What the act, error or omission was and when it occurred; and

**(2)**    The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.**    If a "claim" is made or "suit" is brought against any insured, you must:

**(1)**    Immediately record the specifics of the "claim" or "suit" and the date received; and

**(2)**    Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.**    You and any other involved insured must:

      **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

      **(2)**    Authorize us to obtain records and other information;

      **(3)**    Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

      **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

    **d.**    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, admit liability or incur any expense without our consent.

**G.**    For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

    **1.**    You will have the right to purchase an Extended Reporting Period, as described below, if:

      **a.**    This endorsement is cancelled or not renewed; or

      **b.**    We renew or replace this endorsement with insurance that:

        **(1)**    Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

        **(2)**    Does not apply to an act, error or omission on a claims-made basis.

    **2.**    The Extended Reporting Period does not extend the policy period or change the scope of coverage provided.  It applies only to "claims" for acts, error or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule.  Once in effect, the Extended Reporting Period may not be cancelled.

    **3.**    An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

      You must give us a written request for the endorsement within 30 days after the end of the policy period.  The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

      We will determine the additional premium in accordance with our rules and rates.  In doing so, we may take into account the following:

      **a.**    The "employee benefit programs" insured;

      **b.**    Previous types and amounts of insurance;

      **c.**    Limits of insurance available under this endorsement for future payment of damages; and

    **d.**    Other related factors.

The additional premium will not exceed 200% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.**    If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount of the Aggregate Limit shown in the Schedule of this endorsement under Limits of Insurance.

**Paragraph E.1.b.** of this endorsement will be amended accordingly.  The Each Employee Limit shown in the Schedule will then continue to apply as set forth in **Paragraph E.1.c.**

**H.**    For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

**1.**    "Administration" means:

    **a.**    Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **b.**    Handling records in connection with the "employee benefit program"; or

    **c.**    Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.**    "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.**    "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

**4.**    "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    **a.**    Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    **b.**    Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

     **c.**    Unemployment insurance, social security benefits, workers' compensation and disability benefits;

     **d.**    Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

     **e.**    Any other similar benefits designated in the Schedule or added thereto by endorsement.

**I.**    For the purposes of the coverage provided by this endorsement, Definitions **6** and **32** in the **Definitions** Section are replaced by the following:

     **6.**    "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

     **32.**    "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

          **a.**    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

          **b.**    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

All other terms of your policy remain unchanged.

Endorsement Number:  10

Policy Number:  FLP0054437-03

Named Insured:  Andrews Institute Ambulatory Surgery Center, LLC

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date:  April 15, 2016